[Civ. No. 8030.   Third Dist.   June 27, 1952.]

MORRIS GENSER, Respondent, v. STATE PERSONNEL
BOARD et al., Appellants.

Edmund G. Brown, Attorney General, and Wilmer W. Morse, Deputy Attorney General, for Appellants.

Anthony J. Kennedy for Respondent.

SCHOTTKY, J. pro tem.—Respondent, Morris Genser, who held a position as Investigator, Grade Two, in the Motor Vehicle Department, was suspended from his position on May 6, 1948. Charges were filed against him on May 12, 1948, and the appellant State Personnel Board, through a hearing officer, conducted a hearing on the charges on July 20, 1948. The State Personnel Board found that the following charges against respondent were true:

(1) Engaging in the business of buying and selling automobiles, purchasing the same from new car dealers, while occupying the position of Motor Vehicle Investigator, Grade Two, with the Department of Motor Vehicles, the same being incompatible with his duties as investigator and inimical to the public welfare.

(2) Securing preference in delivery of automobiles from dealers by reason of his official position not accorded other customers.

(3) Falsely representing to dealers that the vehicles purchased were for his own personal use and would not be resold.

(4) Violating Vehicle Code, section 236, by causing a motor vehicle to be registered to a wrong address.

(5) Failing to expedite the issuance of a certain dealer's license as promised.

(6) Falsely representing to an applicant for a dealer's license which he was handling, that the only car he had was a 1938 Chevrolet, and soliciting the applicant's aid in obtaining a new one.

On February 4, 1949, appellant board rendered its decision that respondent be suspended from his position from the date of his suspension to March 1, 1949. Following the denial of his petition for a rehearing, respondent filed a petition for a writ of mandate in the superior court, alleging: That in making said findings of fact, decision and order of suspension and in denying said petition for rehearing, respondent State Personnel Board proceeded in excess of its jurisdiction and committed prejudicial abuse of its discretion as follows:

(a) The acts of petitioner found to be incompatible with the duties of his said position were lawful acts done by petitioner in his private capacity.

(b) The charges, together with the amendments and supplement thereto and the hearing had thereon were an invasion of petitioner's nonofficial private life outside the authority of respondent director and respondent board.

(c) The findings that acts of petitioner were incompatible with the duties of his position are not supported by the evidence.

(d) The order and decision of dismissal and denial of salary are not supported by the findings.

(e) The hearing procedure was defective.

No oral evidence was given upon the trial in the superior court, but the case was submitted on the transcript of the testimony in the hearing before the board, the findings of the board, and the pleadings. The court found that the State Personnel Board acted in excess of its jurisdiction, abused its discretion and acted arbitrarily and capriciously, and found further "that there was no substantial evidence, and the evidence received at said hearing by the State Personnel Board was insufficient to support" the charges against the petitioner.

Appellant contends that the petition does not state a cause of action to set aside the decision of appellant Board, under the theory that the hearing procedure was not in accordance with law, and also that the judgment could not be supported on this theory since the trial court did not find on the allegation (paragraph(e)) that the hearing procedure was defective. However, respondent concedes that no part of the court's order was based upon said paragraph (e) and that upon

failure to find upon it the allegations and contention that the hearing procedure was defective became moot.

Appellant next contends that the petition does not state a cause of action to set aside the appellant board's decision, under the theory that the decision is not supported by the board's findings, because the findings of the board are neither set out in nor attached as an exhibit to the pleadings, nor is the substance of the findings alleged. However, as pointed out by respondent, the entire record of proceedings before the appellant State Personnel Board, including the testimony and the findings, were filed with the court upon stipulation of the parties submitting the case to the court for decision. In view of this we deem it unnecessary to discuss this contention at any length because we believe that the allegations of the petition were sufficient to bring the matter before the court under section 1094.5 of the Code of Civil Procedure, and where, as here, the matter was submitted upon the entire record, it should be disposed of upon the merits rather than upon any technical rules of pleading.

Appellant contends that this proceeding is of the type in which the trial court does not exercise its independent judgment on the evidence but merely determines whether the board's findings are supported by substantial evidence. Respondent, in reply, argues that the superior court under the provisions of section 1094.5 of the Code of Civil Procedure was required to exercise its independent judgment upon the evidence submitted. ▆▆ This same question was before us in the recent case of *Nelson* v. *Department of Corrections,* 110 Cal.App.2d 331 [242 P.2d 906] (hearing denied), and we there held that the trial court in reviewing a decision of the State Personnel Board is bound by the substantial evidence rule and is not entitled to exercise its independent judgment as to the weight of the evidence. In so holding we followed the decisions of the Supreme Court in *Boren* v. *State Personnel Board,* 37 Cal.2d 634 [234 P.2d 981], and *Covert* v. *State Board of Equalization,* 29 Cal.2d 125 [173 P.2d 545]. In view of these authorities we consider that it is now settled that the substantial evidence rule is the rule by which a court is bound in reviewing a decision of the State Personnel Board.

In the case of *Southern California Jockey Club, Inc.* v. *California Horse Racing Board,* 36 Cal.2d 167 [223 P.2d 1], the court quoted from *McDonough* v. *Goodcell,* 13 Cal.2d 741 [91 P.2d 1035, 123 A.L.R. 1205], as follows:

" 'Unquestionably the testimony before the commissioner

would sustain a conclusion either way upon the issue of the good moral character and fitness of the petitioners to engage in the bail bond business in San Francisco. If the trial had been before a court the evidence was sufficient to support findings either way or was sufficient to support a verdict either way on the issue. With this state of the record our inquiry on this phase of the case is at an end, for it cannot be said that there was not a sufficient factual basis for the conclusion of the commissioner and therefore he did not act arbitrarily or otherwise abuse his discretionary power in denying the permit.' "

The court then said:

"Those views have been consistently approved. [Citing cases]. And the rule was not changed by statute as is evident from the wording of section 1094.5 of the Code of Civil Procedure. We therefore hold, that in a case such as this, the trial court should not reweigh the evidence, and its sole function is, to determine from a review of the record, whether there is sufficient evidence to sustain the ruling of the board. If the trial court should hold the evidence insufficient, and this holding is attacked on appeal, the court to which the appeal is taken must review the record and determine the sufficiency of the evidence. If the evidence is found to be sufficient, the ruling of the board must be sustained."

And in *Bank of Italy* v. *Johnson,* 200 Cal. 1 [251 P. 784], which involved judicial review of administrative determination, the court said at page 32:

"When the court is called upon, as in this case, to determine the character and sufficiency of the evidence to justify the writ as against the respondent we are governed by the rule that if there be any substantial evidence in the record which would have supported a conclusion on the part of the respondent that public convenience and advantage would not be promoted by the opening of such branches the writ must be denied. *The rule which applies here is analogous to the rule that if there be any substantial evidence to support the finding of a trial court on an issue of fact, such finding may not be disturbed even though the court on appeal might consider that the evidence preponderated the other way."* (Italics added.)

The rule referred to in the quotation is stated in *Estate of Bristol,* 23 Cal.2d 221, at page 223 [143 P.2d 689], as follows:

"The rule as to our province is: 'In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent,

and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (Italics added.) (*Crawford* v. *Southern Pac. Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183].) The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict. . . . Appellate courts, therefore, if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding. . . .''

Having determined that the substantial evidence rule is the rule by which a court is bound in reviewing a decision of the State Personnel Board, we shall proceed to discuss appellants' contention that the trial court's conclusion that the board's findings are not supported by the evidence is incorrect as a matter of law.

The charges against respondent revolved primarily around the purchase by respondent and his wife of seven new automobiles from new car dealers between February 5, 1947, and March 15, 1948, and the resale of five of them. At the time of these transactions respondent was occupying the position of Motor Vehicle Investigator, Grade Two, and among his duties in addition to ''collecting evidence, interviewing witnesses, and appearing in Court in the prosecution of persons charged with violations of state laws pertaining to the theft, sale, operation, registration and possession of vehicles,'' he was charged with the duty of ''investigating alleged evasions of the law with respect to the operation of automobile dealers.''

The record shows that during the 13 months preceding March 15, 1948, respondent and his wife, Louise Genser, purchased and sold the following automobiles:

| Name of dealer supplying car | Name of car | Date of purchase | Date of sale | Name of purchaser |
|---|---|---|---|---|
| W. A. Stillwell | Oldsmobile | 2- 5-47 | 3- 1-47 | Louis Green |
| Bryan Motors, Inc. | Oldsmobile | 3-12-47 | 4-24-47 | Florence Epstein |
| Wilmington Motors | Dodge | 9-17-47 | 9-18-47 | Taylor Auto |
| Howard Automobile | Buick | 9-25-47 | 2-12-48 | Taylor Auto |
| J. C. Wooten Pontiac Co. | Pontiac | 10-1 -47 | 1-19-48 | Taylor Auto |
| Martin Pollard | Chevrolet | 2-11-48 | Not Sold | |
| Kaiser Brothers | Oldsmobile | 3-15-48 | - - - - - | |

The automobile purchased from W. A. Stillwell was delivered to respondent on February 5, 1947. Notwithstanding the fact that respondent testified that he told the dealer he wanted and needed it personally, respondent sold the said automobile to Louis Green on March 1, 1947.

The Oldsmobile purchased from Bryan Motors, Inc., was delivered to respondent on March 12, 1947, the check for the purchase price being signed by his wife, Louise Genser. He testified that he told the dealer in January that he wanted a car, that he thought he signed an order but paid no deposit. He resold the automobile on April 24, 1947, to Florence Epstein.

The Dodge 6, four-door sedan purchased from Wilmington Motors was delivered to Louise Genser on September 17, 1947, and was sold by her to Taylor Automobile Company on September 18, 1947. Mr. Ginsburg, owner of Wilmington Motors, testified that Mrs. Genser asked him for a car a year or so before the delivery was made; that he had seen respondent several times and had told him that "I was going to get his wife a car."

The Buick sedanette purchased from Howard Automobile Company was delivered to Mrs. Genser on October 1, 1947, and sold by her to Taylor Automobile Company on February 12, 1948. Mr. Croxall, manager, testified that "the delivery was made and all the transactions in Mr. Morris Genser's name"; that respondent said he wanted a car for his wife.

The Pontiac 8 automobile purchased from Wooten Pontiac Company was delivered to respondent at the factory on October 1, 1947, and sold by him to Taylor Automobile Company on April 19, 1948. Mr. Snowden, office manager and distributor for the Pontiac Motor Company, testified that about September 1, 1947, respondent asked about chance to get a factory drive-out; said he wanted to go back to World Series; that he referred respondent to Mr. Porter, sales manager of one of their dealers, Wooten Pontiac Company, and that on September 11, 1947, he received a factory drive-out request through the mail. The checks for this automobile were drawn by Mrs. Genser.

The Chevrolet Aero sedan purchased from Martin Pollard Company was delivered to Mrs. Genser on February 11, 1948. Mr. Flaherty, chief of plant protection, Chevrolet, at Van Nuys, testified that he first met respondent around the first of the year 1948. We quote from the record:

"A. Well at that time we had a lot of equipment, company

cars that were necessary to go on the road, and we had no dealership in order to get plates, and I couldn't state positive whether he worked through our local Chevrolet dealer, or whether I called Motor Vehicles as to how it operated. We asked if we could have somebody come out to tell us what had to be done and arrange for a dealership.

"Q. (By Mr. Rhone) In any event, a contact was made to the Motor Vehicle Department with reference to getting dealer's plates; is that right? A. Yes, sir.

"Q. And pursuant to that response Mr. Genser came to the plant in Van Nuys? A. Yes, sir.

"Q. And he contacted you when he came there? A. It was necessary at that time, plant procedure, anyone coming on the property would have to clear through me to go into the plant.

"Q. I see. Now, did you handle the matter then, with reference to applying for the dealer's permit? A. No, sir, I introduced him to Mr. Thompson, who was at that time the car distributor for this area, and he made the arrangements for the dealership.

"Q. Well, were you present at part of that conversation? A. I was present practically all of the time.

"Q. Now was there anything stated at that time, and if so, what, with reference to the time it would take to get such a permit? A. (By Mr. Flaherty) Well, as I recall it, there was to be four or five weeks or something. I do know that whatever time was stated was far longer than we could afford to wait for the necessary plates.

"Q. (By Mr. Rhone) Well, now, who made the statement as to how long it would take? A. I believe Mr. Genser was the one. He must have been; he was the only one present.

"Q. And do you recall how long he stated it would take? A. No, I don't recall exactly how long; I think it was four or five weeks or something was necessary on it, putting us through.

"Q. And did you ask him, or was there anything said, about getting it done in less time than that? A. We did. We asked him if there wasn't any way possible and would he do everything he possibly could in order that we could get this dealership through; we couldn't afford to wait that long.

"Q. And—Well, tell us what he said in response to that. A. Well, he took it. He said he would go down and get the papers—I am not sure whether he had them with him at the time, but he said he would do everything possible through

Sacramento and through whoever it was that he worked for, and he would follow it through, and that the very minute that the plates were received, and the dealership books, he would bring them out.

"Q. Then in the matter of several weeks, you received a permit, did you? A. As to the exact date, I wouldn't know, because previous to that and during that time, we called on Mr. Genser a number of times and he contacted the proper parties to straighten out quite a number of our supervisors who had out of town cars and needed transfers, registration, and so forth, and I am not sure which one of those times he did favors for us that he came out with those dealer's plates and books, because he was there before and after that.

"Q. Now, you say he was there quite a few times, was he? A. (By Mr. Flaherty) Yes, sir.

"Q. And did you notice what kind of a vehicle he drove at that time? A. Yes, I—I gave him a little rib about it. I allowed him to park in my parking space, and if I recall, he was driving an old car and I was ribbing him, threatening to throw him off the place if he didn't drive a better car, and I think he said that's all the state gave him, or that's all he had; I don't know which way it came up now, but that's all he said at the time.

"Q. Did—Prior to the time of the delivery of the permit, did Mr. Genser make any request to you to get a new Chevrolet? A. No, sir; that was my suggestion.

"Q. You state that it was your suggestion that the company supply—see that he could purchase a new Chevrolet? A. In view of what he had done for the company and several others—the rest of the supervision, I suggested to Mr. Thompson that if he wanted a car, he be given a car.

"Q. And is that the car, then, that was subsequently sold to Martin Pollard and for Mr. Gensler? A. Well, as far as that is concerned, it's only hearsay with me, because once I made the request to Mr. Thompson, I knew no more about it."

Respondent testified that he talked to Mr. Thompson of the Chevrolet plant about getting a Chevrolet and that he had the car registered in Mrs. Genser's name. Mr. Taggart, sales manager of the Martin Pollard Company, testified:

"Q. (By Mr. Rhone) Well, was that sale made by your company or was it one that was assigned to the Chevrolet plant? A. It was assigned. Courtesy delivery.

"Q. Courtesy delivery? A. For the wholesale organization.

"Q. And do you know in whose name it was assigned as the buyer? A. Morris Genser."

The Oldsmobile purchased from Kaiser Brothers' distributors was delivered to Mrs. Genser on March 15, 1948. The car was ordered by respondent.

The two cars last mentioned were the only ones of the seven purchased that had not been resold at the time the charges were filed against respondent.

Respondent denied that he had exerted, or attempted to exert, any influence that he may have had by reason of his position in order to get delivery of any of the automobiles, and the various dealers testified that respondent had not been accorded any preference by reason of his position.

The record also shows that while respondent was being cross-examined at the hearing he was asked: "Now these vehicles that we have mentioned here are not the only vehicles you purchased during 1946 and 1947?" Respondent's counsel objected to this question and the hearing officer sustained the objection. We think that the evidence should have been admitted as it might have thrown additional light on respondent's actions with reference to the purchase of automobiles from dealers.

Appellants contend that there is substantial evidence that respondent did engage in the business of buying and selling automobiles, purchasing the same from new car dealers, while occupying the position of. Investigator, Grade Two; that he did secure preference in delivery of automobiles from dealers by reason of his official position; and that such conduct was incompatible with his duties as investigator and inimical to the public welfare.

Appellants set forth the duties of an investigator in the position of respondent, the material part of which we have hereinbefore mentioned.

Section 19572 of the Government Code sets out the causes for disciplinary action against state civil service employees. Specifically listed are "(b) incompetency," "(c) inefficiency," "(g) dishonesty" and "(q) violation of this part or board rule." The phrase "this part" means part 2, division 5, title 2 of the Government Code, which is the State Civil Service Act (§ 18570). Also listed as a cause is "(r) any other failure of good behavior or acts which are incompatible with or inimical to the public service."

Sections 19250 and 19251, a part of the State Civil Service Act, provided as follows:

"19250. Every state employee shall fulfill to the best of his ability the duties of the office or position conferred upon him and shall prove himself in his behavior inside and outside the service worthy of the esteem which his office or position requires. In his official activities the State employee shall pursue the common good, and, not only be impartial, but so act as neither to endanger his impartiality nor to give occasion for distrust of his impartiality."

"19251. A State officer or employee shall not engage in any other activity or enterprise inconsistent, incompatible, or in conflict with his duties as a State officer or employee."

██ Bearing in mind the rule that in reviewing the evidence before the Personnel Board all conflicts must be resolved in favor of the findings of the board and all legitimate and reasonable inferences indulged in to uphold their decision, we are satisfied that there is substantial evidence that respondent did engage in buying and selling automobiles which he was able to purchase from new car dealers by reason of preference gained through his official position. ██ It is a matter of common knowledge, of which this court will take judicial notice, that during the years 1947 and 1948 there ·was a great shortage of automobiles, due to the curtailment of production of automobiles during World War II, and that the average citizen had to wait for a long period to get a new automobile. ██ The record shows that respondent and his wife purchased seven new automobiles from dealers between February 5, 1947, and March 15, 1948, and resold five of them. It is fairly inferable from the evidence that respondent directed the purchase and sale of said automobiles. Notwithstanding the denials of respondent and some of the dealers that no preference was given to respondent because of his official position, the appellant Personnel Board was not required to accept such explanation, because it is unreasonable and unrealistic to believe that any private citizen who was not charged with investigating the licensing and transactions of new car dealers would have been able to purchase the number of new automobiles purchased by respondent at the time when they were purchased.

██ Respondent argues that the acts found to be incompatible with the duties of his said position were lawful acts done in his private capacity and that the charges were an invasion of his nonofficial private life outside of the authority

of the Director of Motor Vehicles and the Personnel Board. With this contention we do not agree. While said acts may not have been unlawful in a criminal sense, we feel that they were inconsistent and incompatible with his position as investigator in the Motor Vehicle Department, that they were contrary to the spirit and intent of article XXIV of the Constitution establishing civil service, and that they were violative of the portions of the Civil Service Act hereinbefore set forth. The people of California adopted the Civil Service constitutional amendment in order to secure a high standard of public service and a high standard of conduct in public service. The State Civil Service Act was enacted to implement and carry out the constitutional amendment. The State Personnel Board was created to administer the act and to carry out the high purposes of the constitutional amendment and the act. The act states that every state employee "shall prove himself in his behavior inside and outside the service worthy of the esteem which his office or position requires," and that "he shall not engage in any other activity or enterprise inconsistent, incompatible, or in conflict with his duties as a state officer or employee." For an employee in the position of respondent to purchase from the dealers he was required to investigate the number of automobiles that the record shows he did purchase at the time he did purchase them, and then resell five of them within a short period, as shown by the record, is conduct which can only add to the growing citicism of the public service, and is conduct which, if the action of the State Personnel Board to eliminate it is not upheld by the courts, will eventually destroy confidence in civil service itself and do a great injustice to the thousands of civil service employees who are living up to the high standards of the constitutional amendment and the act.

The decision of the Personnel Board was as follows:

"That for the acts as found to be true as set forth hereinabove, and for each of said acts separately and severally, the respondent is hereby suspended from the date of his suspension to March 1, 1949, and from his position as Motor Vehicle Investigator, Grade Two, of the Department of Motor Vehicles of the State of California."

■ It is clear that the board intended to exact the penalty imposed on each count of the charges, and in view of the fact that we have reached the conclusion that the findings as to the first two charges are supported by substantial evidence, it is unnecessary to discuss at any length the remaining

charges and findings. The State Personnel Board here has done what in effect a court does when a defendant in a criminal prosecution is convicted on a number of counts and decrees that the sentences shall run concurrently. The rule in criminal law is that where one is convicted on two counts and sentenced thereon, the sentences to run concurrently, a subsequent invalidation of the conviction on one count will not secure the release of the defendant. (*In re Davis,* 13 Cal. App.2d 109 [56 P.2d 302].) So even if we should find that any or all of the remaining charges and findings are not supported by substantial evidence, we would still be required to reverse the judgment requiring appellant Personnel Board to set aside its decision. However, we shall refer briefly to the remaining charges.

As to the charge that respondent falsely represented to dealers that the vehicles purchased were for his own personal use and would not be resold, there is evidence that respondent stated to at least one dealer that he wanted a car and needed it personally.

As to the charge that respondent violated Vehicle Code, section 236, by causing a motor vehicle to be registered to a wrong address, there is evidence that he did give the address of the Motor Vehicle Department instead of his home address when purchasing the Chevrolet. But there is also evidence that he almost immediately discovered the mistake and took steps to correct it, so the evidence with reference to this charge could hardly be considered substantial. Likewise as to the charge that respondent failed to expedite the issuance of a certain dealer's license as promised.

As to the charge and finding that respondent falsely represented to an applicant for a dealer's certificate, which he was handling, that the only car he had was a 1938 Chevrolet state-owned vehicle, and soliciting the applicant's aid in obtaining a new one, the testimony of Mr. Flaherty hereinbefore set forth shows that respondent told him when he "ribbed" respondent about driving an old car: "That's all the state gave him, or that's all he had," and "In view of what he had done for the company and several others—the rest of the supervision, I suggested to Mr. Thompson that if he wanted a car, he be given a car."

We are convinced that the decision of the State Personnel Board in the instant case is based upon substantial evidence, and that the board did not act arbitrarily or otherwise abuse its discretionary power in imposing the extremely

mild penalty that was imposed in this case. We are inclined to agree with appellants' statement that "respondent should consider himself fortunate that the Board merely suspended him instead of discharging him, as the appointing power requested." If it should be held in this case that the acts of respondent were not "an activity or enterprise inconsistent, incompatible or in conflict with his duties as a State officer," and that a court is justified upon the record here in setting aside the decision of the State Personnel Board suspending respondent for such acts and conduct, the position of Motor Vehicle investigator would be an extremely desirable and profitable position in the event of another era of shortage of automobiles. The official duties of respondent included investigating alleged evasions of the law with respect to the operations of automobile dealers. The acts and conduct of respondent in his dealings with said dealers, as hereinbefore set forth, were contrary to both the letter and spirit of the civil service constitutional amendment and act. To hold that such acts were not incompatible with the position held by respondent would also be contrary to sound public policy.

In view of the foregoing the judgment is reversed.

Peek, J., and Van Dyke, J., concurred.