[Civ. No. 17225. First Dist., Div. One. Aug. 19, 1957.]

NORMAN F. BRICE et al., Respondents, v. DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL, Appellant.

Edmund G. Brown, Attorney General, and Charles A. Barrett, Deputy Attorney General, for Appellant.

Walter F. Calcagno for Respondents.

PETERS, P. J.—The licensees were charged with having sold intoxicating liquor to a minor. The officer who presided at the hearing of the accusation issued a proposed decision finding the charges to be true and recommended a 15-day suspension of the off-sale general liquor license of the licensees. The proposed decision was adopted as the decision of the Department. The licensees appealed to the Alcoholic Beverage Appeals Board and it sustained the decision of the Department. The licensees then petitioned the superior court for a writ of mandate. The matter was heard on August 12, 1955. On that same day the superior court entered a minute order reading in part: "It was by the Court ordered that the petition be granted, Writ to issue. Findings to be prepared." On September 22, 1955, findings of fact and conclusions of law were signed and filed. Thereafter, a motion for a new trial was filed which was denied on January 5, 1956. Judgment ordering the issuance of the writ was signed and filed January 11, 1956. The Department of Alcoholic Beverage Control appeals from that judgment, the notice of appeal having been filed March 5, 1956.

At the inception of the argument we are met by the contention of respondents that the appeal should be dismissed because the notice of appeal was filed too late. It is argued that the 60-day period to appeal commenced running (a) from August 12, 1955, the date of the first minute order, or (b) from September 22, 1955, the date the findings and conclusions were signed, or (c) that the denial of the motion for a new trial on January 5, 1956, started a 30-day period to run in which the appeal had to be filed. If any of these contentions is correct then the notice of appeal, filed on March 5, 1956, was filed too late. The appellant contends that it had 60 days from January 11, 1956, the date the judgment was signed, filed and entered in the judgment book, in which to appeal, and that the notice of appeal filed on March 5, 1956, was, therefore, filed within time. The position taken by appellant is undoubtedly correct.

*Did the time to appeal start to run from the minute order of August 12, 1955?*

Respondents contend that it did, citing *Steen* v. *Board of Civil Service Commrs.*, 26 Cal.2d 716 [160 P.2d 816]. That case held that an appeal lies from a minute order *denying* an application for a writ of mandate, where the order of denial does not provide for further action by the trial court. It is probably true that the rule of that case applies to a simple order *granting* a writ of mandate. But, in the instant case, the minute order expressly stated: ''Writ to issue. Findings to be prepared.'' This demonstrates to a certainty that further court action was contemplated. Respondents argue that this provision was meaningless because, in such a proceeding, findings are not required. It is probably true that in such a proceeding findings are not required, but that does not alter the fact that by its minute order the court expressly stated that further court action was contemplated.

Rule 2(b)(2) of the Rules on Appeal provides: ''The date of entry of an appealable order which is entered in the minutes shall be the date of its entry in the permanent minutes, unless such minute order as entered expressly directs that a written order be prepared, signed and filed, in which case the date of entry shall be the date of filing of the signed order.'' This rule was adopted to provide an objective test by which the finality of orders could be determined for purposes of appeal. It was intended to establish certainty as to just when the period to appeal commences to run. It was designed to remove the traps for the unwary that existed

under prior law, and was not passed to create new traps. (*Pessarra* v. *Pessarra*, 80 Cal.App.2d 965 [183 P.2d 279]; *Herrscher* v. *Herrscher*, 41 Cal.2d 300 [259 P.2d 901]· 3 Witkin, California Procedure, p. 2294; 17 So. Cal. L. Rev. 79, 86.) ██ The direction in the minute order that ''Writ to issue. Findings to be prepared'' is a direct indication that a formal order was to follow, and thus brings into operation the last part of Rule 2(b)(2). The minute order of August 12, 1955, was, therefore, a preliminary order which did not operate to start the period running in which to appeal.

*Did the time to appeal start to run from the entry of the findings of fact and conclusions of law on September 22, 1955?*

Respondents rely on cases such as *LaMar* v. *Superior Court*, 87 Cal.App.2d 126 [196 P.2d 98], and *Hoover* v. *Lester*, 16 Cal.App. 151 [116 P. 382], in support of their contention that this question should be answered in the affirmative. ██ Those cases hold that the entry of judgment is merely a ministerial duty of the clerk, and that the findings and conclusions constitute the court's decision. But these cases and that rule have nothing to do with the time within which to appeal. ██ The case law is unanimous to the effect that an appeal does not lie from the findings of fact or conclusions of law. (*Estate of Resler*, 43 Cal.2d 726 [278 P.2d 1]; *Muchenberger* v. *City of Santa Monica*, 206 Cal. 635 [275 P. 803]; *Miller* v. *Sharpe*, 54 Cal. 590; *Rawley* v. *Rawley*, 94 Cal.App.2d 562 [210 P.2d 891]; *Estate of Murphy*, 50 Cal.App.2d 440 [123 P.2d 129]; *Ouzoonian* v. *Vaughan*, 64 Cal.App. 369 [221 P. 958].) ██ This rule is based on the fact that section 664 of the Code of Civil Procedure provides that: ''In no case is a judgment effectual for any purpose until entered,'' and upon the rule that until entry the judge can change his previously rendered judgment as he sees fit. (*Phillips* v. *Phillips*, 41 Cal.2d 869 [264 P.2d 926].)

*Did a 30-day period in which to appeal start to run on January 5, 1956, when the motion for a new trial was denied?*

In support of an affirmative answer to this question respondent places his confidence in rule 3(a)(1) of the Rules on Appeal, which reads that ''if the motion [for a new trial] is denied, the time for filing the notice of appeal from the judgment is extended for all parties until 30 days after either entry of the order denying the motion or denial thereof by operation of law.'' Appellant, appropriately, calls atten-

tion to rule 2(a). It provides that the "notice of appeal shall be filed within 60 days from the date of entry of the judgment, unless the time is extended as provided in Rule 3."

In other words, rule 3(a)(1) operates only to *extend* the time in which to appeal, and never to cut down the time provided by rule 2(a). (See comments of the draftsman of the rules in 17 So. Cal. L. Rev. 79 at p. 94.) Since the date of entry of the judgment was January 11, 1956, under rule 2(a) the appellant had 60 days from that date in which to appeal. Rule 3(a)(1) did not operate to cut that period down. Thus, the appeal filed on March 5, 1956, was filed in time. (See *Verdier* v. *Verdier*, 118 Cal.App.2d 279 [257 P.2d 723].)

### The Appeal on Its Merits

Before discussing the facts, brief reference should be made to the rule of law applicable to the review of decisions of the Department of Alcoholic Beverage Control. That agency is a constitutional agency that has succeeded to some of the powers of the State Board of Equalization in alcoholic beverage control matters. Being an agency upon which the Constitution has conferred limited judicial powers, its decisions on factual matters must be affirmed if there is substantial evidence to support them. (Cal. Const., Art. 20, § 22; *Covert* v. *State Board of Equalization*, 29 Cal.2d 125 [173 P.2d 545]; *Kirchhubel* v. *Munro*, 149 Cal.App.2d 243 [308 P.2d 432]; *Molina* v. *Munro*, 145 Cal.App.2d 601 [302 P.2d 818]; *Dethlefsen* v. *State Board of Equalization*, 145 Cal. App.2d 561 [303 P.2d 7]; *Griswold* v. *Department of Alcoholic Beverage Control*, 141 Cal.App.2d 807 [297 P.2d 762].)

In other words, on the mandamus proceeding, the trial court was not permitted to exercise an independent judgment on the facts, as it may do in reviewing the findings of legislatively created state-wide administrative agencies, but was required to give to the factual determinations of the appellant the same deference that an appellate court must give to the findings of a trial court. Thus, the trial court was simply called upon to determine whether the findings of the Board were supported by substantial evidence.

Tested by this rule the evidence taken before the hearing officer, and weighed by him and the Department, clearly supports the findings of the Department. Phillip Ryan, on the date of the claimed purchase, was a minor, being then 18 years of age. He testified that on the night of June 28, 1954, he purchased a pint of Gilbey's gin and

a quart of mix from the liquor store operated by respondents in Marin City, and that the sale was made to him by one Ferrari. Admittedly, Ferrari on that date, was employed by respondents. Ryan testified that Ferrari did not ask for any identification or ask him any questions about his age. This was the first time Ryan had ever been in the store. He was driven to the store by another minor, Charles Butler, who remained outside and did not observe the transaction. He did, however, observe Ryan go into the store empty-handed and, in about three minutes, come out with a bag containing a pint of gin and a quart of mix.

The boys testified that the purchase was made about 8:45 p.m. on June 28, 1954. After the purchase they drove to a market and got some ice and paper cups and then drove to Sebastopol. On the way they consumed over half of the gin. In Sebastopol they were accosted by the police and what remained of the bottle of gin was discovered on the front seat of their car. They were told to report to the Sebastopol police department the next morning, which they did. They first told the police that Charles Butler's father had left the gin in the car, then that they had picked up an "airman" who bought the liquor for them, but finally stated that they had purchased it at respondents' store in Marin City. In company with Board of Equalization officers that same day—June 29, 1954—they drove back to Marin City and the boys pointed out respondents' premises as the place of purchase.

Mr. Phillips, a state liquor control officer, testified that the boys directed him to respondents' premises; that one of the partner licensees, in response to a question, stated that a clerk by the name of Rosenstock, then on duty, had also been on duty the night before; that Ryan was positive that Rosenstock had not sold him the gin; that it then developed that one Ferrari, a manager of another store operated by respondents, had dropped in the previous evening and, as a courtesy, had waited on a few customers to help Rosenstock. Ferrari was then summoned. He denied selling any gin to Ryan, and, in fact, claimed that the only sales made by him the night before had been of cigarettes. Phillips testified that when Ryan was asked if Ferrari had sold him the gin Ryan replied that "he wasn't positive, he couldn't be sure." At the hearing, however, Ryan was definite that he had purchased the gin at respondents' store and that Ferrari had sold it to him. Ryan, at the hearing, also pointed out that on the

counter of the store where he bought the gin was a large display of Kent cigarettes. The employees of the licensees admitted that such a display was on the counter where Ryan said it was.

Phillips testified that while he was in the respondents' store on June 29, 1954, he went to the shelves where the gin was kept and noted that the first four federal stamp numbers on the bottles of Gilbey's gin there located corresponded with the first four numbers on the bottle of gin taken from Ryan. There were seven numbers on the stamps, but the last three numbers on the seized bottle had been torn off when the bottle was opened.

This evidence obviously supports the findings of the Department that on the night in question respondents sold to Ryan a pint of gin. In arguing to the contrary respondents contend that the testimony of Ryan was so inconsistent as to be of no evidentiary value. Attention is called to the three stories he told the police as to the source of liquor. The equivocal nature of his identification of Ferrari as the seller is emphasized. Although he was positive of his identification of Ferrari at the time of the hearing, on June 29, 1954, he once stated that when he first saw Ferrari he was not sure that he was the seller, but later said that he was sure as soon as he saw the man. Objection is made to the accuracy of the descriptions of the seller he had given the police. At the time of Ferrari's criminal trial* he testified that on June 29, 1954, he had told the officers the seller was 5 feet 8 inches tall, weighed about 150 pounds, was middle aged, that is, between 40 and 50, and that he did not remember whether the seller wore glasses or was bushy-headed or balding. At the hearing before the hearing officer Ryan testified that he told the officers that the seller was bald, and also testified that he had never told anyone that the seller was bald. Ferrari was 33 years of age, rapidly balding, and always wore glasses. Attention is also called to the fact that Ryan was not too clear in his testimony as to where the gin was located in the store.

The testimony of Charles Butler, the other minor, is treated by respondents "as of no importance," because Butler was not in the store when the purchase was made. Attention is

---

*Ferrari, based on the facts of this transaction, was charged, criminally, with selling liquor to a minor. He was convicted, but the trial judge granted a motion for a new trial on the ground of insufficiency of the evidence. Later the district attorney moved to dismiss on the ground that the evidence was insufficient to warrant a retrial. The motion was granted.

also called to the fact that the seized bottle of gin was not introduced into evidence to corroborate the officer's statement about the numbers on the federal stamps. Respondents also place considerable reliance on a cash register tape which is supposed to have registered all sales on the day in question. The evidence shows that the pint of gin involved then cost $2.41, plus 7 cents tax, and that the mix cost 20 cents, plus 5 cents deposit, plus 1 cent tax, making a total of $2.74. The evidence shows that the tape does not record a $2.74 sale on the day in question, nor any series including the numbers above enumerated, although the attorney general calls attention to one series of numbers in consecutive order which do total $2.74.

This evidence did no more than create a conflict. The evidence shows conclusively that Ryan obtained the gin at respondents' establishment. Ryan and Butler positively and unequivocally identified that establishment as the place where the gin was obtained. Although Ryan was somewhat doubtful of his identification of Ferrari as the salesman, he was positive that he had bought the gin from a salesman in the establishment. That established the offense warranting the suspension. (Bus. & Prof. Code, § 24200; *Cornell* v. *Reilly,* 127 Cal.App.2d 178, 186 [273 P.2d 572].) Moreover, at the hearing Ryan positively identified Ferrari as the salesman. His prior equivocations merely went to his credibility. In such a proceeding it was for the hearing officer and the Department to pass on credibility—not the trial court. The cash register tape was evidence in respondents' favor— but it was not controlling. It must be remembered that Ryan did not testify that the sale was rung up on the cash register. Ferrari may not have rung it up or he may, as salesman frequently do, have corrected a prior error by ringing up different numbers than were called for by the sale. These were matters for the trier of the fact.

As already pointed out, the trial court in the mandate proceeding should have reviewed the evidence and the findings of the Department in the same fashion that an appellate court reviews the findings of trial courts. Tested by this standard the evidence amply supports the findings.

 The last contention of respondents is that the Department of Alcoholic Beverage Control had no jurisdiction to order the license suspended, because the hearing officer, when he made his recommendation, was an employee of the State Board of Equalization, and the department (created

by constitutional amendment effective January 1, 1955) had no power to adopt his findings. It is contended that because Business and Professions Code, section 23051, provides, in effect, that the powers of officers, such as hearing officers, terminated on that date, the department had no jurisdiction to adopt his findings made when he was an employee of the State Board of Equalization. The point scarcely requires serious consideration. Section 23054 of the Business and Professions Code provides that the employees of the state board who exercised the powers assumed by the department, were transferred to the department. Section 23052 of the same code makes applicable certain provisions of the Government Code, including section 11162 of that code. That section provides: "No law creating a new department affects any act done, ratified, or confirmed, or any right accrued or established, or any offense committed, or any action or proceeding had or commenced in a civil or criminal cause before such law takes effect; but such right may be enforced, offense punished and action or proceeding prosecuted and continued by the department having or acquiring jurisdiction of the subject matter to which such litigation or proceeding pertains, with the same effect as if the transfer of such rights, powers, duties, responsibilities and jurisdiction had not been made to the department."

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.