[Civ. No. 20215. First Dist., Div. One. Jan. 21, 1963.]

MALCOM E. HARRIS, as Director of the Department of Alcoholic Beverage Control, Plaintiff and Appellant, v. ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD et al., Defendants and Respondents.

108

Stanley Mosk, Attorney General, and Wiley W. Manuel, Deputy Attorney General, for Plaintiff and Appellant.

Leo K. Gallant and Anthony E. O'Brien for Defendants and Respondents.

SULLIVAN, J.—This is an appeal by the Department of Alcoholic Beverage Control (hereinafter called the Department) through its director, Malcom E. Harris, from a judgment of the trial court denying a petition for a writ of mandate or writ of certiorari, and discharging an alternative writ of mandate, directing the Alcoholic Beverage Control Appeals Board (hereinafter called the Appeals Board) to reverse its decision reversing the decision of the Department that the on-sale beer and wine license of Bernice Keene and

Lovitta Richardson (hereinafter called the licensees) be revoked.[1]

On May 6, 1959, the Department filed a first amended accusation in two counts against the licensees doing business as Nellie's at 789 Howard Street, San Francisco.[2] Count I charged that in the six-month period between September 1, 1958, and February 28, 1959, the licensees exercised the privileges conferred upon them by their license at the above premises in such a manner as to constitute a law enforcement problem for the Police Department of the City and County of San Francisco. Count II charged that during the same six-month period the licensees permitted the licensed premises to be used as a disorderly house and a place to which people resorted for purposes injurious to the public morals, health, convenience and safety in that intoxicated persons were permitted to frequent the establishment.

The above acts set forth in both Counts I and II were charged as providing grounds for the suspension or revocation of licensees' license under article XX, section 22 of the California Constitution and section 24200, subdivision (a) of the Business and Professions Code.[3] It was also charged that the acts set forth in Count II provided additional grounds for such suspension or revocation under section 24200, subdivision (b) in that such acts were a violation of section 25601 (keeping a disorderly house).[4] There had been no prior disciplinary action against the licensees.

---

[1]The licensees as well as the Appeals Board are respondents on this appeal. However the licensees have not filed briefs herein, having advised us that they join in the briefs of the Appeals Board.

[2]The original accusation against the licensees was filed on April 8, 1959, charging them with maintaining a disorderly house.

[3]Unless otherwise indicated, all code references hereafter are to the Business and Professions Code.

Section 24200 in relevant part provides: ''The following are the grounds which constitute a basis for the suspension or the revocation of licenses: (a) When the continuance of a license would be contrary to public welfare or morals; but proceedings under this section upon this ground are not a limitation upon the department's authority to proceed under Article XX, Section 22, of the Constitution.''

California Constitution, article XX, section 22 in relevant part provides: ''The department shall have the power, in its discretion, to deny, suspend or revoke any specific alcoholic beverage license if it shall determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals, . . .''

[4]Section 24200 provides in relevant part: ''The following are the grounds which constitute a basis for the suspension or the revocation of licenses: . . . (b) Except as limited by Chapters 11 and 12 of this division, the violation or the causing or the permitting of a violation by a licensee of this division, . . . or any other penal provisions of

The Department, adopting the proposed decision of the hearing officer who found all of the charges to be true, revoked the license on each of the two counts. The licensees appealed to the Appeals Board. That board determined that the Department's findings were not supported by substantial evidence in the light of the whole record and reversed the decision of the Department. The Department then filed in the court below its petition for a writ of mandate and for writ of certiorari and the matter was submitted on such petition, the return thereto, and the entire administrative record, not only of the proceedings before the Department but also of those before the Appeals Board but without the court receiving any additional evidence. The trial court found that "the Appeals Board correctly decided that the decision of the Department was not supported by substantial evidence in the light of the whole record" and denied the petition. It is from such judgment that the Department now takes this appeal.

The appellant makes two contentions before us: (1) That there is substantial evidence in the record to support the determination of the Department that the licensed premises were a police problem; and (2) that there is such substantial evidence to support the findings that the premises were a disorderly house.

We first make some observations concerning the nature and scope of our review. The Constitution of California confers upon the Department of Alcoholic Beverage Control "the power, in its discretion, to . . . suspend or revoke any specific alcoholic beverage license if it shall determine for good cause that the . . . continuance of such license would be contrary to public welfare or morals. . . ." (Cal. Const., art. XX, § 22.) The same section of the Constitution confers upon the Alcoholic Beverage Control Appeals Board the power, upon an appeal thereto by any aggrieved person, to review the decision of the department "subject to such limitations as may be imposed by the Legislature. In such cases, the board shall

---

law of this State prohibiting or regulating the sale . . . of alcoholic beverages or intoxicating liquors."

Section 25601 provides: "Every licensee, or agent or employee of a licensee, who keeps, permits to be used, or suffers to be used, in conjunction with a licensed premises, any disorderly house or place in which people abide or to which people resort, to the disturbance of the neighborhood, or in which people abide or to which people resort for purposes which are injurious to the public morals, health, convenience, or safety, is guilty of a misdemeanor."

not receive evidence in addition to that considered by the department. Review by the board of a decision of the department shall be limited to the questions whether the department has proceeded without or in excess of its jurisdiction, whether the department has proceeded in the manner required by law, whether the decision is supported by the findings, and whether the findings are supported by substantial evidence in the light of the whole record." (Cal. Const., art. XX, § 22.) In addition, and insofar as is pertinent here, section 23084 provides that " [t]he review by the board of a decision of the department shall be limited to the questions: . . . (d) Whether the findings are supported by substantial evidence in the light of the whole record." ▮▮ The powers thus conferred upon the Appeals Board are strictly limited and "certainly no greater than those previously exercised by the courts on judicial review of the decisions of the State Board of Equalization." (*Martin* v. *Alcoholic Beverage Control Appeals Board* (1959) 52 Cal.2d 238, 246 [340 P.2d 1], citing *Covert* v. *State Board of Equalization* (1946) 29 Cal.2d 125 [173 P.2d 545].) ▮ The phrase "substantial evidence in the light of the whole record" signifies no more than the adoption of the substantial evidence rule "as generally applied in judicial proceedings in this state" and therefore the Appeals Board in its review of the sufficiency of the evidence to support the administrative findings of the Department is governed by such substantial evidence rule. (*Martin* v. *Alcoholic Beverage Control Appeals Board, supra,* pp. 246-247.)

▮ It is also well and long established that the judicial review of a decision of the Department, invoked by the filing in the superior court of a petition for a writ of mandate, is also limited in scope. Such court is not entitled to exercise its independent judgment on the effect and weight of the evidence as it is permitted to do when reviewing the findings of legislatively created statewide administrative agencies, but is simply called upon to determine whether the findings of the Department are supported by substantial evidence. (*Morell* v. *Department of Alcoholic Beverage Control* (1962) 204 Cal.App.2d 504, 507 [22 Cal.Rptr. 405]; *Benedetti* v. *Department of Alcoholic Beverage Control* (1960) 187 Cal.App. 2d 213, 216-217 [9 Cal.Rptr. 525]; *Brice* v. *Department of Alcoholic Beverage Control* (1957) 153 Cal.App.2d 315 [314 P.2d 807]; *Oxman* v. *Department of Alcoholic Beverage Con-*

*trol* (1957) 153 Cal.App.2d 740, 744 [315 P.2d 484].)[5] In many instances and in all of the immediately preceding cases, the Appeals Board has affirmed the Department and judicial review by mandamus is sought in respect to the decision of the Department as affirmed by the Appeals Board. ██ In the instant matter it is to be noted that the Appeals Board has not upheld the decision of the Department. Where therefore, as here, the judicial review sought in the superior court is directed at the decision of the Appeals Board reversing the decision of the Department, it is clear ''that any judicial determination of whether the Appeals Board had exceeded its 'limited' powers would incidentally require a review of the decision of the Department and of the record upon which the Department's decision had been based.'' (*Martin* v. *Alcoholic Beverage Control Appeals Board, supra,* 52 Cal.2d 238, 245.)

The cause at bench now rests on the third successive level of review. We must determine whether the trial court properly reviewed the decision of the Appeals Board by reviewing ''the evidence and the findings of the Department in the same fashion that an appellate court reviews the findings of trial courts.'' (*Brice* v. *Department of Alcoholic Beverage Control, supra,* 153 Cal.App.2d 315, 323.) It is equally obvious at this point that any determination on our part as to whether or not the court below has erred implicitly requires us to consider whether the Appeals Board has exceeded its limited powers, and in turn enjoins our review of the very fundament of the proceedings, the decision and record of the Department itself.

We reach this final result: The scope of review at each of the three levels of review is the same and consists in the application of the substantial evidence rule to the original record of the Department. ██ It is now our function, as it was that of the Appeals Board and the court below, merely to determine whether the findings of the Department are supported by substantial evidence. ██ In making this determination we must resolve all conflicts in the evidence in favor of the Department's decision and indulge in all legitimate and reasonable inferences to support it. (*Morell* v. *Department of Alcoholic Beverage Control, supra,* 204 Cal.App.

---

[5]At this level of judicial review the substantial evidence rule governs in giving effect to a similar statutory provision, namely, that ''abuse of discretion is estabilshed if the court determines that the findings are not supported by *substantial evidence in the light of the whole record.*'' (Code Civ. Proc., § 1094.5, subd. (c); emphasis added.)

2d 504, 508; *Oxman* v. *Department of Alcoholic Beverage Control, supra,* 153 Cal.App.2d. 740, 744; *Marcucci* v. *Board of Equalization* (1956) 138 Cal.App.2d 605, 608-609 [292 P.2d 264].) This is the extent of our review. ▮ Neither the Appeals Board nor the courts "may disregard or overturn a finding of fact by the Department . . . for the reason that it is considered that a contrary finding would have been equally or more reasonable." (*Bowman* v. *Alcoholic Beverage Control Appeals Board* (1959) 171 Cal.App.2d 467, 471-472 [340 P.2d 652].)

We turn to the administrative record. It shows that the licensed premises were located on Howard Street, San Francisco, in a block having a high incidence of arrests for drunkenness and vagrancy and commonly referred to as "skid-row." They adjoined the entrance to the Niagara Hotel. During the six months' period involved in the accusation, Officer Frank Syme of the San Francisco Police Department, whose beat included Nellie's entered the establishment at least twice during each eight-hour shift. On these night shifts he was usually accompanied by Officer Kenneth Barton. On these inspections he made arrests inside the premises for intoxication, vagrancy and receiving stolen property. He estimated that during the period in question he made no less than five arrests per week for intoxication. The general practice then was to place the arrested person in a patrol wagon for transportation to the police station. The driver would be given the information as to the place of arrest. Nellie's bar and the adjoining Niagara Hotel seem to have shared the same address of 789 Howard Street. Officer Syme testified that he rarely made arrests at the hotel but that when he did he distinguished between the two locations in the police report.

Officer Sheridan Williams patrolled the same beat as Officer Syme but on opposite night shifts. He was usually accompanied by Officer Werner. He entered Nellie's bar at least once each shift. During the period involved he made on an average of two to three arrests a week inside the premises for intoxication. Usually the persons he arrested were not drinking at the time but were "drunks standing around," leaning against the wall or talking to someone.

Officer Robert Werner, who was Officer Williams' partner, heard the latter's testimony and testified that if the same questions were asked him, his answers would be substantially the same. He was not cross-examined.

Officer Daniel Lynch, who was assigned to the statistical

bureau of the San Francisco Police Department, made, from the official records, a compilation of the arrests for intoxication in the City and County of San Francisco. During the six-months' period involved, there were 12,497 such arrests in the entire city and 4,998 in the Southern Police District in which Nellie's was located.

Captain August G. Steffen of the Southern Police District had 31 years' experience in the San Francisco Police Department, culminating in 7 years as a lieutenant and 3½ years as a captain. In his opinion ''Nellie's'' was a police problem during the period involved because of the number of arrests for drunkenness made by the two night platoons. On cross-examination, the Captain testified that the Southern District was the only one in which a patrol wagon accompanied the police officers on their rounds. He also stated the policy of the police department in respect to the degree of intoxication a person must be under before an officer arrests him in the following words: ''A person who has lost his normal functions, can't walk properly, eyes bleary, in many cases untidy due to drippings from the chin, in many cases urinating on themselves—there are many reasons.''

Officer Kenneth Barton, who was a partner of Officer Syme, testified that he entered ''Nellie's '' two or three times a night. Approximately five arrests a week were made inside the establishment for intoxication either by the witness, his partner Syme, or their sergeant. Usually Syme made the arrest. The officer testified that no one who was sober was ever booked for intoxication. A fair construction of his testimony is that the persons arrested by him or his companion officers were in fact intoxicated.

Lovitta Richardson, one of the licensees, usually worked on the premises from 5 or 5:30 p. m. to 2 a. m. four nights a week. Her sister and colicensee, Bernice Keene, worked approximately the same hours the other three nights. Miss Richardson testified that during the period in question Officers Syme and Barton and Sergeant Considine entered the bar ''nothing less than twice'' during her shift; that Syme would ''start grabbing a customer'' and have him go outside; and that the persons removed from her premises on these occasions were not intoxicated. She claimed that any intoxicated persons removed by the officers had run inside her establishment when they saw the patrol wagon approaching. When this occurred, she ordered such persons off the premises.

About five arrests a week were made of her regular customers as distinguished from persons running in off the street. The regular customers however were not intoxicated. On cross-examination she testified that the officers removed at least two persons each night she worked and estimated that Officer Syme thus removed about eight of her regular customers a week. In addition, the officers removed from the premises each week on an average of five or six persons who had run inside and were referred to by the witness as "winos."

Mrs. Keene, the other licensee, also testified. It was stipulated "that her answers on direct examination will be the same." We construe this to mean the same as Miss Richardson's answers upon subjects where the witness had the same testimonial knowledge. On cross-examination she testified that during the six months' period she worked three days a week, usually for a four-hour shift; that during such time Officers Werner and Williams together with a sergeant made about one or two arrests a month for intoxication.

The licensees called five other witnesses. Bert Kramer, who serviced the jukebox in "Nellie's," visited the premises once a week, never saw anyone intoxicated there. During the period involved, he observed uniformed police on the premises and once or twice saw only one arrest being made, did not know the reason for such arrest, and was of the opinion that the person was not intoxicated. Wendell Allen, who had an amusement device in the establishment, went there once a week in the evening but never saw an intoxicated person on the premises. He observed Officer Syme make arrests on three separate occasions but the persons arrested did not appear to be drunk. At one time Syme removed four persons at once, grabbing them off stools at the bar saying " 'You're drunk, get outside.' " These persons did not appear to be drunk.

William Mallard, a regular Friday and Saturday night patron, testified that the police usually walked in and looked around and "just walk over to the bar and grab a couple off the stools and take them out" although the persons removed did not appear to be intoxicated. He never saw an intoxicated person at the bar. On occasions he saw intoxicated persons come in off the street but they were not served and were told to get out.

Mrs. Jack Martinez, a friend of one of the licensees, visited the establishment once or twice a month on either a Friday or Saturday night. She never saw any arrests made on the

premises. Nor did she see any intoxicated persons there, although such persons did come in and were "chased right out."

Jack Strickland, the bartender at Nellie's, worked usually from 10:30 a. m. until 6 p. m., occasionally working nights and weekends. He testified that he saw the police remove people from the bar who were not intoxicated and that whenever an intoxicated person entered the premises he was told to leave, and, if he refused to do so, was escorted out.

In rebuttal, the Department offered and there were received in evidence, over the objection of the licensees, 101 arrest records of the San Francisco Police Department for the premises at 789 Howard Street. In his memorandum on decision, the hearing officer credited this exhibit as establishing the following: that there were 100[6] arrests for drunkenness during the period; that 75 of the arrests were made by Officers Syme and Barton; that of the 100 arrest records, 14 listed the Niagara Hotel as the residence of the person arrested. Implicit in this conclusion of the hearing officer is the assumption that persons not residents of the Niagara Hotel would have no business on the hotel premises and that therefore there could be at the most only 14 arrests which might have been made in the hotel rather than at "Nellie's."

Officer Edmund Anderson was then called as a witness. He testified that he was the court officer of the police department; that he received from the captain of the Southern Station a list of 76 names of persons arrested for intoxication with instructions to verify such arrests; and that he searched the court records and noted on the list the disposition of the cases opposite the respective names of the arrestees. Each item on the list furnished Officer Anderson consists merely of a date, time and name. The list begins with an item for September 2, 1958, and ends with an item for February 27, 1959. Although identified by the officer as a list of 152 arrests "which means drunk cards"[7] the list nowhere contained the address where the persons were arrested. Officer Anderson admitted that he did not know the place of arrest and had not compared the list with the arrest records previously admitted in evidence through Officer Cames. However, the

---

[6]This was probably an error. Actually there were 101 arrests.
[7]Presumably the reference is to section 152 of the Municipal Police Code of San Francisco, which also appears on the official arrest records admitted in evidence through Officer Cames.

list shows an identity of names, dates and times with the corresponding arrest record and a separate arrest record is found for each of the 76 names on the list. The list was offered by the Department to counter an argument of the licensees and establish that in the majority of instances the person arrested was in fact found guilty of being intoxicated in violation of the Municipal Police Code. Along with Officer Anderson's notations thereon, it was received in evidence, over the licensees' objection, that no proper foundation had been made and that the list was hearsay.

We encounter no difficulty in finding in the foregoing record substantial evidence to support the administrative finding of the Department that the licensed premises presented, during the period involved, a law enforcement problem for the San Francisco Police Department. Throughout the entire six months' period, the police found intoxicated persons on the premises. Surveillance and inspection of the establishment were constantly required. Even under liberal criteria of inebriety arrests were frequent and continuous over the period involved. It is a fair conclusion from the testimony as a whole that intoxicated persons were congregating in this bar with apparent regularity. It is not disputed that this was illegal under the city's Police Code. Indeed it was the testimony of both the captain of the district and the officer making most of the arrests that the establishment presented a law enforcement problem. The testimony offered by the licensees merely raised a conflict in the evidence which was resolved against them by the hearing officer.

█ Where premises licensed for the sale of alcoholic beverages are operated in such a manner as to make them a law enforcement problem for the police, public welfare and morals are directly involved and affected. (See *Torres* v. *Department of Alcoholic Beverage Control* (1961) 192 Cal.App.2d 541 [13 Cal.Rptr. 531]; *Parente* v. *State Board of Equalization* (1934) 1 Cal.App.2d 238 [36 P.2d 437].) If the law enforcement problem emerges, as it does here, from repeated instances of intoxicated patrons found on the premises in violation of a local ordinance, it is fatuous to maintain that these conditions of doing business do not offend public welfare or morals until or unless the intoxicated patron has aggravated them by performing some additional improper, illegal or immoral act on the premises. A tolerant society and sensible law enforcement may accept on occasion the bibulous patron in the bar. But pacific behavior does not confer upon the

common drunk a vested right in a public place. ▮ Moreover, where, as here, the presence of such a patron on the premises and his removal and arrest by public authority occur with alarming regularity, it is naive to suppose that these conditions of the establishment prevailed without the permission and consent of the licensee. Apparently, in the instant cause, the hearing officer rejected the licensees' protestations to such effect.

Respondent Appeals Board argues that the *Torres* case, *supra* and the *Parente* case, *supra,* are not material here because they involved applications for licenses rather than proceedings for their suspension or revocation. ▮ While there are procedural differences between application matters and disciplinary matters, there are basically no substantial differences. In both, it is the responsibility of the Department to safeguard the public interest. The same clause of the Constitution invests the Department with the "power, in its discretion, to deny, suspend or revoke" a license. (Cal. Const., art. XX, § 22.) In both proceedings, public welfare and morals are to be preserved in the one case from probable impairment in the future, in the other, from actual, existing injury.

Respondent also contends that the entire area in which the licensed premises are located constitutes a police problem and that this problem cannot be used as a basis for revoking the license here involved. This argument has reference to the statistics in the record showing that approximately 40 per cent of arrests made in San Francisco for drunkenness took place in the Southern Police District. Respondent sharpens the point by noting that the area problem is further localized on the very block of "skid-row" where the licensees do business. In our view, this is tantamount to an attempt by the Appeals Board to reweigh the evidence in the record and, by thus reaching a conclusion which it considers more reasonable, to usurp the function of the Department. This, the Appeals Board cannot do. (*Bowman* v. *Alcoholic Beverage Control Appeals Board, supra,* 171 Cal.App.2d 467, 471-472.) Nor are we impressed with the argument on its merits. If such a policy of enforcement were adopted it would mean that the license of offending premises in a notorious neighborhood could not be suspended or revoked unless that Department clearly demonstrated that the establishment was a worse offender than its competitors. Conceivably under such a

policy, concerted action on the part of a number of licensees to harbor the drunken patron would render all immune from discipline under the umbrella of the resultant ''area'' conditions. As part of this contention, the respondent urges that the police were not summoned by the proprietors because of any disturbance but made the arrests on ''round-ups.'' The incidents were nonetheless violations of law. Respondent also claims that ''[t]here is not a single shred or iota of evidence'' that the licensees permitted even one intoxicated person on the premises. We disagree. Drunken persons were arrested repeatedly on the premises. Police standards governing such arrests indicate that such persons were placed under arrest only when they had reached advanced and obvious stages of intoxication. The evidence taken as a whole supports the inference that these occurrences, which were not isolated, infrequent or unusual ones, were open and in full view and thus easily detectable by the bartender's discerning eye. The Appeals Board concedes that proof of intoxication does not require expert opinion evidence. Certainly ample evidence is furnished in the instant case by experienced officers of the law.

We turn to Count II. On this count the hearing officer found that the licensees permitted the licensed premises to be used as a disorderly house in violation of section 25601 in that a minimum number of 58 intoxicated persons were allowed to frequent the establishment during the six months' period.[8] Obviously the finding represents the determination of the Department that there were *at least* 58 instances of intoxication on the premises. However, the testimony of the arresting officers, summarized above, to the effect that they made many arrests during the above period also supports the charge of violating section 25601.

The Department's determination that there were a minimum of 58 intoxicated persons appears to have been based on the documentary evidence of arrests and disposition thereof. The arrest records of the police department showed 101 arrests at 789 Howard Street during the above period. The hearing officer disregarded a total of 14 of these where the residence of the arrested person was also given as 789 Howard Street, apparently on the reasoning that the arrest might have been made at the hotel instead of at Nellie's bar. The list showing

---

[8]The following were specified as minimum number of persons arrested for intoxication month by month: 1958: September, 10; October, 4; November, 15; December, 15; 1959: January, 4; February, 10.

disposition of arrests which was compiled by Officer Anderson shows a total of 76 persons, all of whom were apparently convicted of being intoxicated in a public place. It thus appears that the hearing officer adjusted this number for the total possible arrests at the hotel and arrived at a minimum figure of 58.[9]

Respondent Appeals Board contends that the police arrest records were ''without value'' since they contained nothing but the initial step in determining the guilt of the person arrested and that the record of the disposition of the cases, compiled by Officer Anderson, was hearsay.

The arrest records were the official records of the San Francisco Police Department. They were so identified by Officer Cames who produced them at the hearing and described the manner in which they were prepared and maintained. The entries in such records were therefore prima facie evidence of the facts stated therein. (Code Civ. Proc., § 1920.)

The second exhibit which was a compilation made by Officer Anderson of the disposition of the cases of 76 arrested persons, all of whose names appear on the foregoing arrest records, presents a different question. Clearly this list of arrested persons and the officer's annotations in respect to the disposition of their cases, were hearsay. It was not an official record. The officer had no personal knowledge of the arrest. Nor did the officer testify of his own knowledge, or in fact have any personal knowledge, as to the conviction and sentencing of the persons arrested.

Section 11513, subdivision (c) of the Government Code, which is applicable to the administrative hearing presently under review (Gov. Code, § 11501), provides that ''[h]earsay evidence may be used for the purpose of supplementing or explaining any direct evidence but shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions.'' As we have pointed out, the above documents would not be so admissible. Initially the exhibit was offered by counsel for the Department to show that in most of the arrests, the arrested persons ''were in fact found guilty of intoxication.'' In his memorandum on decision, the hearing officer referred to the exhibit as showing that ''a great majority of such persons were convicted of drunkenness.'' However there is no express finding of *con-*

---

[9]Actually, we find 16 arrests showing residence at the hotel. If these are deducted from the 76, the resultant figure would be 60.

*viction* of intoxication. The pertinent finding is merely that a minimum of 58 intoxicated persons were permitted to frequent the establishment. There was direct evidence given by the two principal arresting officers that they made many arrests of persons who were intoxicated according to police standards. Officer Syme testified that he made on an average of five such arrests a week; Officer Williams testified that he made two or three such arrests a week. The official arrest records of the police department establish 101 arrests, which should be considered reduced by 16 arrests, as we have pointed out, to produce a total of 85 arrests. All of the foregoing is direct evidence and sufficient by itself to support the finding that during the period in question a minimum of 58 intoxicated persons frequented the establishment. We think, therefore, that despite the use of the phrase ''convicted of drunkenness'' in the memorandum on decision, Officer Anderson's compilation, which was hearsay, can be deemed to have been used for the purpose of supplementing and explaining the direct evidence. (*Swegle* v. *State Board of Equalization* (1954) 125 Cal.App.2d 432, 437-438 [270 P.2d 518] ; *Cooper* v. *State Board of Public Health* (1951) 102 Cal.App.2d 926, 932 [229 P.2d 27] ; *Moyer* v. *State Board of Equalization* (1956) 140 Cal.App.2d 651, 656 [295 P.2d 583] ; see generally Witkin, Cal. Evidence, § 10, pp. 12-13 ; 142 A.L.R. 1388.)

Respondent Appeals Board contends that there must be some evidence of improper, illegal or immoral conduct occurring on the licensed premises before disciplinary action can be supported under section 25601, citing *Stoumen* v. *Reilly* (1951) 37 Cal.2d 713 [234 P.2d 969]. That case held that the mere fact that homosexuals congregated at a bar and restaurant without proof of the commission by them of illegal or immoral acts on the premises, or a resort thereto for such purposes, did not establish cause for disciplinary action against the licensee. The rationale of such holding was that all members of the public of lawful age have a right to patronize a public restaurant so long as they act properly and the proprietor has no right to exclude them except for cause. The gist of respondent's argument here is that just as a person may be a homosexual and yet observe proper decorum, so even intoxicated persons may observe proper decorum on licensed premises.

There is however a basic distinction between the homosexual and the drunkard. Decorum on the part of the former may conceal his unfortunate tendencies. The latter, however, of

necessity externalizes his condition, although he is present but in repose. But in the instant matter, the mere presence in a public bar of such an intoxicated person was in violation of law. *Stoumen* held that "mere proof of patronage, without proof of the commission of *illegal* or immoral acts on the premises, or resort thereto for such purposes, is not sufficient to show a violation. . . ." (37 Cal.2d at p. 716; emphasis added.) Here, the mere act of being intoxicated or drunk on the licensed premises was an illegal act. In addition, it is a fair inference from the testimony in the record that the persons arrested in the instant matter were in a state of intoxication which was offensive to the public at large. Contrary to respondent's argument, it is not the past conduct, immoral character or bad reputation (cf. *Stoumen* v. *Reilly, supra*) of the patron which subjects the licensee to discipline but his present act and condition which offends both the law and public decency.

 In our view, the evidence in the record amply supports the finding that the licensees were guilty of violating section 25601. Over a substantial period of time intoxicated and drunken patrons were permitted to congregate in the establishment. Police surveillance was a constant necessity. Arrests for intoxication were frequent and regular. It is beyond question that a minimum of 58 intoxicated persons were permitted to frequent the establishment. Indeed, the evidence supports a much larger figure. Such evidence of drunkenness supports the conclusion that the licensed premises were permitted to be kept and used as a disorderly house. (See *Swegle* v. *State Board of Equalization, supra*, 125 Cal. App.2d 432; *Givens* v. *Department of Alcoholic Beverage Control* (1959) 176 Cal.App.2d 529 [1 Cal.Rptr. 446].)

 Opposed by such evidence, respondent's claim that there is no evidence that the licensees *permitted* even one intoxicated person on the licensed premises must fall. "Section 25601 does not provide that the condition of the licensed premises denounced by it must be knowingly created." (*Morell* v. *Department of Alcoholic Beverage Control, supra*, 204 Cal.App.2d 504, 511. See also *Benedetti* v. *Department of Alcoholic Beverage Control, supra*, 187 Cal.App.2d 213, 215-216; *Givens* v. *Department of Alcoholic Beverage Control, supra*, 176 Cal.App.2d 529, 534; *Swegle* v. *State Board of Equalization, supra*, 125 Cal.App.2d 432.) The word " 'permit' implies no affirmative act. It involves no intent. It is mere passivity, abstaining from preventative action."

(*Dorris* v. *McKamy* (1919) 40 Cal.App. 267, 274 [180 P. 645].) As the court stated in *Givens* v. *Department of Alcoholic Beverage Control, supra,* 176 Cal.App.2d 529, 534, ''The law demands that . . . [the licensee] in fact so conduct his business that it meets the minimum requirements of decency and morality. If, as in this present case, the overwhelming evidence shows that the tavern is in fact a 'disorderly house,' there can be but one conclusion: that the licensee has permitted or suffered such a condition to exist.''

We conclude that the administrative determination of the Department is supported by substantial evidence on both counts and that the court below erred in not issuing a writ of mandate directing the Appeals Board to reverse its decision.

The judgment is reversed with instructions to the trial court to enter new findings of fact and conclusions of law in accordance with the views herein expressed and to issue a peremptory writ of mandate directing the respondent Appeals Board to vacate and set aside its previous order and decision and to affirm the original decision of the Department.

Bray, P. J., and Molinari, J., concurred.

A petition for a rehearing was denied February 6, 1963, and the petition of respondent Alcoholic Beverage Control Appeals Board for a hearing by the Supreme Court was denied March 20, 1963.