[Civ. No. 20086. Third Dist. June 30, 1981.]

DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL,
Petitioner, v.
ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD,
Respondent;
ROBERT E. HUTCHINS et al., Real Parties in Interest.

550

**COUNSEL**

George Deukmejian, Attorney General, Richard D. Martland, Assistant Attorney General, and Susan P. Underwood, Deputy Attorney General, for Petitioner.

William B. Eley for Respondent.

John M. Fredenburg and Peter J. Sailors for Real Parties in Interest.

## OPINION

**BLEASE, J.**—The Department of Alcoholic Beverage Control (department) seeks review of an order of respondent Alcoholic Beverage Control Appeals Board (board) reversing a decision of the department which denied an application by real parties for issuance of an on-sale beer and wine license. (Bus. & Prof. Code, § 23090.)

In 1979 real parties applied for an onsale beer and wine license for the Marmalade Max Disco, in Roseville, California. The department denied the license on the ground that it "would create a law enforcement problem for the Police Department of Roseville." (Bus. & Prof. Code, § 23958.)[1] The board rejected the department's determination as unsupported by the findings and the findings as unsupported by substantial evidence (Cal. Const., art. XX, § 22, ¶ 7; Bus. & Prof. Code, § 23084, subds. (c), (d)), but affirmed the denial on an alternative ground (zoning restrictions). The department petitioned this court for a writ of review, which we granted. Real parties have since obtained zoning approval and (upon our rejection of the department's motion for a stay) have been granted an on-sale beer and wine license for their establishment. We affirm the decision of the board.

### FACTS

The Marmalade Max Disco is located near the city limits of Roseville in an area described by police witnesses as remote. Its remoteness, coupled with an increase in city population without a corresponding increase in police officers, they said, resulted in infrequency of police patroling and a longer response time to calls for help.

Sergeant Richard Fancher, supervisor of the late-night patrol shift, estimated that the average response time to the establishment was 10 to

---

[1]At the time of the administrative hearing, Business and Professions Code section 23958 provided: "Upon receipt of an application for a license or for a transfer of a license and the applicable fee, the department shall make a thorough investigation to determine whether the applicant and the premises for which a license is applied qualify for a license and whether the provisions of this division have been complied with, and shall investigate all matters connected therewith which may affect the public welfare and morals. The department shall deny an application for a license or for a transfer of a license if either the applicant or the premises for which a license is applied do not qualify for a license under this division. [¶] The department further may deny an application for a license *if issuance of such license would tend to create a law enforcement problem*, or if issuance would result in or add to an undue concentration of licenses and the applicant fails to show that public convenience or necessity would be served by such issuance." (Italics added.) (Amended by Stats. 1963, ch. 1642, § 2, p. 3232.)

15 minutes, though it depended on where the patrol car was when it received a call, and it might be as long as 20 minutes. Officer Frederick Rockholm testified that, on the three occasions he was called to the Marmalade Max Disco, his response time had varied (according to where he was when he received the call) from 5 or 10 minutes to 10 or 15 minutes. Officer William Hughes of the police department's administrative division testified that, during a recent period, the average police response time, city-wide, was 13.92 minutes.

The department found on the basis of this evidence that real parties' establishment was "remote" and the police department's manpower "limited," and that, as a result, response time to the establishment was "slow."[2]

It was not seriously disputed, and the department accordingly found, that "some police problems" had occurred at the Marmalade Max Disco during the period it was operated without an alcoholic beverage license. The police witnesses testified that the department responded to about four calls per month at the establishment, for a variety of situations, including "numerous" false alarms, liquor law (primarily age) violations, petty thefts, stolen automobiles and a stolen motorcycle, fighting and disturbing the peace, and at least one "serious" assault.

The evidence was in substantial conflict, however, as to the effect of granting the license, since real parties proposed to change the character of the establishment. "Disco" music would continue to be played, but persons under 21 years of age would be excluded. This would itself, real parties thought, discourage younger persons from coming there and drinking in their cars, a problem that had existed to some extent. In seeking a beer and wine license, real parties "aim[ed]" at attracting a "sophisticated," monied clientele, aged 21 to 30 or 35. A dress code would be enforced. This "crowd" would be unlike that of the bars in Roseville that featured "rock" music; the owner testified that he had never seen a fight in any of a number of bars elsewhere which catered to the type of clientele he sought to attract. The establishment would

---

[2]The department found: "The proposed premises, if licensed, would create a law enforcement problem for the Police Department of Roseville. The premises are remote and manpower of the Department is limited. It is reasonable to infer from evidence that, despite efforts of the petitioners['] security force, disturbances sometimes would occur when several hundred young persons would gather together in the described surroundings. Response time for the Police Department is slow because of distance and the nature of Douglas Boulevard."

continue to employ two uniformed security guards, and would hire an "adequate[]" number of "bouncers" (probably four). Finally, due to structural modifications, occupancy would be cut from 800 to about 400.

On the other hand, city Police Chief James A. Hall testified that police problems had arisen at licensed establishments in the city that featured music favored by "younger people." Such "loud, young" music, he said, "seems to draw the people there that loiter and drink and get involved in other illegal activity," such as drunk driving and fights. Captain Robert Leighty agreed that the type of music played at an establishment "has a lot to do with the type of person it attracts." Officer Rockholm testified that 17 to 20 year olds tended to congregate around and try to enter licensed establishments that feature music. Sergeant Fancher testified that, in his experience, anywhere an establishment begins to serve alcoholic beverages, the incidence of fighting and drunk driving increases. Officer Hughes indicated that bars at which "loud rock music" was played required a disproportionate number of police responses. The department apparently found it unnecessary to resolve this conflict in the evidence, concluding merely that it was "reasonable to infer ... that, despite efforts of the [real parties'] security force, *disturbances sometimes would occur* when several hundred young persons would gather together in the described surroundings." (Italics added.) (See *ante*, fn. 2.)

## DISCUSSION

■ On review of the board's reversal of the department's determination, we are limited, as was the board, to determining whether the department proceeded illegally or exceeded its jurisdiction, whether relevant evidence was unavailable or improperly excluded, and whether the department's findings supported its decision and were themselves supported by substantial evidence. (Bus. & Prof. Code, § 23090.2; *Kirby* v. *Alcoholic Bev. etc. Appeals Bd. (Schaeffer)* (1972) 7 Cal.3d 433, 436 [102 Cal.Rptr. 857, 498 P.2d 1105].)[3] ■ The depart-

---

[3]Business and Professions Code section 23090.2 provides: "The review by the court shall not extend further than to determine, based on the whole record of the department as certified by the board, whether:
"(a) The department has proceeded without or in excess of its jurisdiction.
"(b) The department has proceeded in the manner required by law.
"(c) The decision of the department is supported by the findings.
"(d) The findings in the department's decision are supported by substantial evidence

ment's determinations that issuance of a license to real parties would "create a law enforcement problem" (Bus. & Prof. Code, § 23958) and is "contrary to public welfare and morals" (Cal. Const., art. XX, § 22)[4] were based on findings that (1) despite real parties' employment of a security force, "disturbances sometimes would occur when several hundred young persons would gather together in the described surroundings" and, if such disturbances occurred, (2) due to its remote location and the limited number of police officers, police could not respond quickly to the establishment. We conclude that finding (1) does not support the department's decision and that finding (2) is not supported by substantial evidence. We affirm the board's decision.

One crucial purpose of a requirement that an administrative agency make findings in connection with its decisions is to expose the agency's mode of analysis to a reviewing court. (*Bakman* v. *Department of Transportation* (1979) 99 Cal.App.3d 665, 688 [160 Cal.Rptr. 583]; *Kirby* v. *Alcoholic Bev. etc. App. Bd.* (*Lopez*) (1969) 3 Cal.App.3d 209, 218 [83 Cal.Rptr. 89]; see also *Robinson* v. *State Personnel Bd.* (1979) 97 Cal.App.3d 994, 1003-1004 [159 Cal.Rptr. 222].) Proper findings "direct the reviewing court's attention to the analytic route the administrative agency traveled from evidence to action." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].)[5] Findings are a prerequisite to our review of a department decision and we are directed to determine whether "[t]he decision of the department is supported by the findings." (Bus. & Prof. Code, § 23090.2, subd. (c); *ante*, fn. 3.)

in the light of the whole record.

"(e) There is relevant evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing before the department.

"Nothing in this article shall permit the court to hold a trial de novo, to take evidence, or to exercise its independent judgment on the evidence."

[4]Article XX, section 22 of the state Constitution provides, in pertinent part: "The Department of Alcoholic Beverage Control shall have the exclusive power, except as herein provided and in accordance with laws enacted by the Legislature, to license the manufacture, importation and sale of alcoholic beverages in this State, and to collect license fees or occupation taxes on account thereof. The department shall have the power, in its discretion, to deny, suspend or revoke any specific alcoholic beverages license if it shall determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals, or that a person seeking or holding a license has violated any law prohibiting conduct involving moral turpitude. It shall be unlawful for any person other than a licensee of said department to manufacture, import or sell alcoholic beverages in this State."

[5]The department also "determin[ed]" as factual matters that "[t]he proposed premises, if licensed, would create a law enforcement problem . . . ." and that "[i]ssuance of

Business and Professions Code section 23958 authorizes the denial of "a license if [its] issuance ... would tend to create a law enforcement problem." The department impliedly found this standard to have been met in finding, as a prediction, that "disturbances sometimes would occur" at the Marmalade Max Disco.

While the language of section 23958 might otherwise be susceptible of the very broad reading given to it by the department findings, we must interpret it in light of the constitutional requirement of "good cause" for the denial of a license (Cal. Const., art. XX, § 22, ¶ 5), which may not be impaired by legislative enactment. (*Martin* v. *Alcoholic Bev. etc. Appeals Bd.* (1961) 55 Cal.2d 867, 875 [13 Cal.Rptr. 513, 362 P.2d 337].) Whatever the precise parameters of the "law enforcement problem[s]" contemplated by the statute,[6] we agree with the

the license would be contrary to public welfare and morals ...." Such ultimate findings, couched in the language of the governing statutory or constitutional provisions do not properly inform our review of an agency decision; it is by examination of the agency's "relevant subconclusions" that we learn by what applicable standard it acted as it did. (*City of Rancho Palos Verdes* v. *City Council* (1976) 59 Cal.App.3d 869 [129 Cal.Rptr. 173]; *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506, p. 517, fn. 16.)

[6]"Police problem[s]" were cited as a basis for denial of a liquor license long before Business and Professions Code section 23958 was amended in 1963 to explicitly authorize it where issuance "would tend to create a law enforcement problem ...." (Stats. 1963, ch. 1642, § 2, p. 3232.) Thus, in *Parente* v. *State Board of Equalization* (1934) 1 Cal.App.2d 238 [36 P.2d 437], a denial was upheld where the respondent board had before it evidence of a long-standing, "continuous police problem" at the applicant's premises, which the court interpreted as referring to "the difficulty of controlling the lawless, the idle, the dissolute and the criminal element of a city tending to congregate at a designated place ...." (*Id.,* at pp. 244-246.) In *Torres* v. *Dept. Alcoholic Bev. Control* (1961) 192 Cal.App.2d 541 [13 Cal.Rptr. 531], the court was concerned with the added difficulty of enforcing liquor control laws in an area of "undue concentration" of licensed establishments in which 75 arrests were made each week for public drunkenness and other offenses. (*Id.,* at pp. 546-547.) In *Harris* v. *Alcoholic Bev. Con. Appeals Bd.* (1963) 212 Cal.App.2d 106 [28 Cal.Rptr. 74], revocation of an establishment's license was justified by the fact that intoxicated persons were arrested there almost daily. (*Id.,* at pp. 114-120.) More recently, in *Kirby* v. *Alcoholic Bev. etc. Appeals Bd. (Schaeffer)* (1972) 7 Cal.3d 433 [102 Cal.Rptr. 857, 498 P.2d 1105], the Supreme Court upheld a determination that issuance of an off-sale beer and wine license would create a law enforcement problem where the evidence showed that the proposed premises were located at the edge of the campus of the University of California at Santa Barbara, in a small community nearly surrounded by the campus; that the village had the highest crime rate in the county; that at least 50 to 60 percent of persons arrested there were under the influence of alcohol; and, critically, that there had recently been a number of riots and other University-related disturbances (including the burning of a bank) in the immediate vicinity of the premises, which prompted concern that in any future disturbance the establishment might be broken into and liquor consumed by looters and rioters. (*Id.,* at pp. 437-441.) Nothing in these decisions supports the department's view of what constitutes a law enforcement problem. In all of

board that the department's reliance upon a finding that "disturbances" (of undetermined severity) would "sometimes" (in the indefinite future) occur reflects altogether "too sweeping" a view of what constitutes "good cause" to deny a license to serve alcoholic beverages.[7] Even if we accepted, and we do not, the department's additional finding that police response time to the establishment was "slow," such a vague, temporally open-ended standard appears to us unsupportable.[8]

■ The requirement of "good cause" mandates that the department not act arbitrarily in denying a license. (*Martin* v. *Alcoholic Bev. etc. Appeals Bd., supra*, 55 Cal.2d at p. 876.) "As the cases make clear, ... the Department's role in evaluating an application for a license to sell alcoholic beverages is to assure that the public welfare and morals are preserved 'from *probable impairment* in the future.'" (Italics added.) (*Kirby* v. *Alcoholic Bev. etc. Appeals Bd. (Schaeffer), supra*, 7 Cal.3d at p. 441.) ■ The department's finding runs far afield of

---

them, there was repeated or on-going criminal conduct of legitimate and substantial concern to law enforcement agencies, not a mere expectation that "disturbances would sometimes occur."

[7]The board said: "[W]e believe the department's determination that 'disturbances would sometimes occur' as too sweeping a basis for denial of the license. An applicant should not be required to guarantee that *no* disturbances would occur at the proposed premises. The department did not determine that past conduct constituted a law enforcement problem. The evidence does not establish that enforcement of the law was hampered due to the time required for the police to arrive at the premises, because of it being located at the boundary of the city. Moreover, we do not consider the fact that the manpower of a local police department is limited as being relevant to the issue whether the operation of a licensed premises would cause a law enforcement problem, or as constituting a basis for prohibiting the establishment of a legitimate business (*Flores*, AB-4164, August 19, 1975). Based on the foregoing, we conclude the department's determination that issuance of the license would *create* a law enforcement problem is not supported by substantial evidence; it is merely speculative."

[8]The board concluded that there was not substantial evidence to "establish that enforcement of the law was hampered due to the time required for the police to arrive at the premises." We agree. While there was testimony that the premises in question are geographically remote from business and residential centers, the average police response time to the establishment was estimated to be between 10 and 15 minutes, whereas the city-wide average response time was approximately 14 minutes. Moreover, there was undisputed testimony that, though it had not previously been on any established patrol "beat," police had recently been patrolling the vicinity of the "disco" twice a night. The general short-handedness of the police department, which was cited as the other factor affecting response time, was correctly rejected by the board as a reason for denial of a license. It places no real constraint (in addition to the illusory one, discussed herein, that disturbances may sometimes occur at the establishment) on the department's discretion to deny a license; there are few communities, we suspect, where the addition of more police officers would not reduce the average police response time to calls.

the standard of "'probable impairment.'" The department's view of what constitutes a "law enforcement problem" is broad enough to embrace all establishments for which licenses might be sought; it is difficult to conceive of a bar of which it can be shown that no disturbance will ever occur there. We cannot accept the department's broad interpretation of the statutory standard for denying a license in Business and Professions Code section 23958 for to do so would eviscerate the constitutional standard of "good cause." Accordingly, we hold that the finding that "disturbances sometimes would occur" does not support the department's decision.

The decision of the board is affirmed.

Paras, Acting P. J., and Perluss, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.