[Sac. No. 5766. In Bank. Oct. 17, 1946.]

E. E. COVERT, Respondent, v. STATE BOARD OF EQUALIZATION et al., Appellants.

126

Robert W. Kenny, Attorney General, J. Albert Hutchinson and Carl W. Wynkoop, Deputies Attorney General, Carl B. Sturzenacker and Allen L. Martin for Appellants.

Ralph E. Swing as Amicus Curiae on behalf of Appellants.

Donald Paul Covert and A. W. Lane for Respondent.

Bernard C. Brennan and John W. Loucks as Amici Curiae on behalf of Respondent.

GIBSON, C. J.—The Superior Court of Sacramento County issued a writ of mandate directing the State Board of Equalization to revoke the on-sale liquor license* of Thomas C. McMillan, operator of a cafe, on the ground that the premises constituted a public saloon, and not a bona fide restaurant, contrary to section 22 of article XX of the California Constitution. The board and the licensee have appealed from this judgment.

Petitioner Covert, a citizen of Glendale, filed a complaint with the board asking that it revoke the license, and hearings were held before a representative of the board at which testimony was taken with respect to the character of the establishment and the manner in which the business was operated. It was shown that the premises consisted of a large cafe containing a bar, and that although the food equipment was of greater value than the bar equipment, approximately 80 per cent of the gross income was derived from the sale of liquor. The board concluded that the evidence did not establish a violation and ordered the complaint dismissed.

This proceeding was then instituted to compel the board to revoke the license. The entire transcript of proceedings before

---

*At the time of the hearing before the board the licensee held two separate on-sale licenses, one for distilled spirits and one for beer and wine. Under the 1945 amendment to section 6 of Alcoholic Beverage Control Act (Stats. 1945, pp. 2615, 2621; 2 Deering's Gen. Laws, Act 3796, § 6) provision was made for a single "on-sale general license" covering both types of sales and, since it may be assumed that the cafe is now operated under such a license, we have here used the term in the singular.

the board was admitted upon the trial and no other testimony was offered. The court found that the principal business of the cafe was the sale of intoxicating liquors and that the serving of food was a pretense and a sham in order to give the business the appearance of a restaurant, and concluded that the place was a public saloon and not a bona fide restaurant. A peremptory writ of mandate was issued directing revocation of the license.

## I. *Proper Parties to This Proceeding.*

■ The board contends that Covert, appearing merely as a citizen, has shown no special interest and, therefore, is not entitled to seek a writ under section 1086 of the Code of Civil Procedure which provides that a writ of mandate may be issued on petition "of the party beneficially interested." Section 40 of the Alcoholic Beverage Control Act (Stats. 1935, pp. 1123, 1143; 2 Deering's Gen. Laws, Act 3796, § 40), provides that "any person" may file a complaint with the board against a licensee, and this right would be of little value if the complainant could not compel the board to perform its duties. A person whose complaint has been rejected by the board has a sufficient interest to institute proceedings for a writ of mandate. (See *Bodinson Mfg. Co.* v. *California E. Com.,* 17 Cal.2d 321, 330 [109 P.2d 935].)

■ Further, with respect to petitioner's right to maintain this proceeding, it is asserted that he has an adequate remedy in the ordinary course of the law under the Unlawful Liquor Sales Abatement Act of 1915 (Stats. 1915, p. 236; 2 Deering's Gen. Laws, Act 3778). Assuming that the act has not been repealed by implication because of the adoption of section 22 of article XX of the Constitution and the State Liquor Control Act of 1933 (Stats. 1933, ch. 658; see *Hammond* v. *McDonald,* 32 Cal.App.2d 187 [89 P.2d 407]), it nevertheless would not afford an adequate remedy. Although the act of 1915 in effect authorizes an abatement proceeding against the building or place used, it does not permit any attack on the license, and a proceeding thereunder could not serve to accomplish the full purpose sought by petitioner, namely, revocation or suspension of McMillan's liquor license.

■ There is no merit in petitioner's contention that the *licensee* has no right to appear as a party or appellant in this mandate proceeding. The licensee was named as a party by petitioner, and it is obvious that he has a direct interest in any proceeding to revoke his license.

## II. Powers and Duties of the Board.

■ The court reweighed the evidence before the board, made new findings, and ordered revocation of the license without remanding the case to the board. An examination of the Constitution of California shows that the State Board of Equalization, unlike most other agencies of statewide authority (see *Laisne* v. *California State Board of Optometry,* 19 Cal.2d 831 [123 P.2d 457]), has specifically been given quasi judicial, or adjudicating power, that is, the right to make determinations of fact which are not subject to reexamination in a trial de novo in the superior court. Section 22 of article XX provides, in part: "The State Board of Equalization shall have the exclusive power to license the manufacture, importation and sale of intoxicating liquors in this State, . . . and shall have the power, *in its discretion, to deny or revoke* any specific liquor license *if it shall determine for good cause* that the granting or continuance of such license would be contrary to public welfare or morals." (Italics added.) In order to revoke a license the board obviously must examine the facts, resolve any conflicts in the evidence, and exercise its judgment with respect thereto. A revocation may be only "for good cause," and, accordingly, the board must afford an opportunity for a full hearing, an essential element of a quasi judicial proceeding. (*La Prade* v. *Department of Water & Power,* 27 Cal.2d 47 [162 P.2d 13]; *Steen* v. *Board of Civil Service Commrs.,* 26 Cal.2d 716 [160 P.2d 816]; *cf. Carroll* v. *California Horse Racing Bd.,* 16 Cal.2d 164 [105 P.2d 110].) This does not mean, of course, that the "discretion" given to the board is absolute, since it must be exercised in accordance with the law.

■ The functions of the board are thus similar in some respects to those of a local administrative tribunal, a decision of which will be sustained if it has committed no error of law and if the evidence, although conflicting, is sufficient to support its findings of fact. (*La Prade* v. *Department of Water & Power, supra,* 27 Cal.2d 47, 53; *Lindell Co.* v. *Board of Permit Appeals,* 23 Cal.2d 303 [144 P.2d 4]; *Walker* v. *City of San Gabriel,* 20 Cal.2d 879 [129 P.2d 349, 142 A.L.R. 1383]; See Tenth Biennial Report of the Judicial Council of California (1944), p. 141.) ■ Further, even if there has been error, the evidence will not be weighed by the court but the matter will be remanded to the board for further consideration. (*La Prade* v. *Department of Water & Power supra.*)

Cases such as *Dare* v. *Board of Medical Examiners;* 21 Cal. 2d 790 [136 P.2d 304], and *Laisne* v. *California State Board of Optometry, supra,* 19 Cal.2d 831, permitting limited or qualified trials de novo after rulings of certain statewide administrative bodies, are based on the theory that the Legislature cannot, under our Constitution, give these agencies powers of a judicial nature. The basic premise of those cases is absent here, however, because the State Board of Equalization is given its liquor control authority directly by the Constitution.

*Board of Trustees* v. *State Board of Equalization,* 1 Cal.2d 784 [37 P.2d 84, 96 A.L.R. 775], and *Standard Oil Co.* v. *State Board of Equalization,* 6 Cal.2d 557 [59 P.2d 119], are not in point as they do not involve the liquor control powers given to the board by section 22 of article XX of the Constitution as amended in 1934.

It would appear, therefore, from the foregoing authorities, that the decisions of the board are final, subject to review for excess of jurisdiction, errors of law, abuse of discretion and insufficiency of the evidence, and that where there is error the matter ordinarily should be remanded to the board for further proceedings.

It follows from the foregoing that section 46 of the Alcoholic Beverage Control Act, as it read prior to its amendment in 1945 (Stats. 1945, pp. 2615, 2644; 2 Deering's Gen. Laws, Act 3796, § 46), was unconstitutional insofar as it purported to authorize the superior court to reweigh the evidence. It may be noted that section 46, as amended in 1945, specifically provides that court review of decisions of the board shall be "Subject to the provisions of Section 22, Article XX, of the Constitution. . . ."

In the present case, even assuming that the facts found by the board disclosed a violation of the Constitution, it was not proper for the trial court to order revocation of the license. This is not a case where the violation, if any, would leave the board with no alternative but revocation, since it is for the board to determine, at least in the first instance, whether the penalty should be revocation or merely suspension. (*Reynolds* v. *State Board of Equalization,* this day decided, *post,* p. 137 [173 P.2d 551].)

### III. *Qualification of the Premises as a Proper Place for Sale of Intoxicating Liquors.*

It is contended in this proceeding that the licensee was

engaged in selling intoxicating liquors in a public saloon, public bar or public barroom and not in a bona fide restaurant. The basic requirements or qualifications for the sale of intoxicating liquors for consumption on the premises are prescribed by section 22 of article XX of the Constitution as amended in 1934, which provides, in part ''Intoxicating liquors, other than beers, shall not be consumed, bought, sold, or otherwise disposed of for for consumption on the premises, in any public saloon, public bar or public barroom within the State; provided, however, that subject to the aforesaid restriction, all intoxicating liquors may be kept and may be bought, sold, served, consumed, and otherwise disposed of in any bona fide hotel, restaurant, cafe, cafeteria, railroad dining or club car, passenger ship, or other public eating place, or in any bona fide club after such club has been lawfully operated for not less than one year.''

In determining whether or not a particular establishment qualifies under the Constitution it is the province of the board to ascertain the facts, for example, the physical aspects, equipment and supplies, the amount of food and liquor sold, and the manner in which the business is conducted. After the probative facts have been settled the problem becomes one of construction and application of the Constitution and pertinent statutes. This, of course, is a question of law for the courts to decide. (See *Bila* v. *Young*, 20 Cal.2d 865, 867 [129 P.2d 364].) The existence of bona fides is not to be determined merely from the expressed intention of the licensee, but, like the determination of whether a place is a ''saloon'' or a ''restaurant,'' it must be ascertained objectively on the basis of all the physical characteristics and the actual mode of operation of the business. These circumstances present questions of fact (*Hammond* v. *McDonald*, 49 Cal.App.2d 671, 686 [122 P.2d 332] ; *cf. Sandelin* v. *Collins*, 1 Cal.2d 147 [33 P.2d 1009, 93 A.L.R. 956]), but the conclusion to be drawn therefrom is a question of law.

The evidence in this case shows that the room in which patrons were served was divided into two portions by a line of booths about five feet high. In one side of the room was a bar or counter and in the other were tables. The space around the bar occupied 480 square feet, whereas the dining room proper occupied 1120 square feet. The kitchen was in a separate room. There were two signs outside the building, one reading ''Tom Tom Cafe'' and one much smaller reading

"Cocktails." Entertainment was furnished to patrons. The equipment for serving food, including two stoves, cost about $3,000, while that used for serving drinks cost about $1,000. Both liquor and food were sold at the bar as well as at the tables, although patrons eating customarily used the tables. Two cooks were employed, "one cook all the time and two cooks Friday, Saturday and Sunday evening." Radio advertisements were devoted largely to the sale of food, including steak and chicken dinners. Neither petitioner nor any of his witnesses claimed that meals were ever refused when requested. As stated above, the gross sales of food amounted to about 20 per cent of the total income.

Petitioner's main contention is that the place could not be deemed a bona fide restaurant because the income from the sale of liquor exceeded that from the sale of food. The Constitution does not provide any such quantitative test, however, but rather it simply requires that there be a bona fide public eating place. "Bona fide" is defined as "in or with good faith; without fraud or deceit; genuine." (See Webster's New International Dictionary (1942).) The sale of liquor is permitted in a bona fide restaurant, and the mere fact that the business of selling food does not produce as much income as the business of selling liquor does not destroy the bona fide character of a restaurant. As a general proposition it is clear that one of several businesses conducted on the same premises may be "genuine" although it may be smaller than the others. There is nothing to indicate that anything different was intended here where the Constitution plainly contemplated the coexistence of two businesses—sale of food and sale of liquors. The fact that the existence of one business was made a prerequisite to the operation of the other does not mean that the former had to be maintained as the larger of the two.

Accordingly, we must reject the contention that the gross food sales of a restaurant or cafe must constitute its principal business in order to qualify it as a bona fide public eating place. The language in *Hammond* v. *McDonald, supra*, 49 Cal.App.2d 671, 685, to the effect that where the sale and service of intoxicating liquor becomes the principal business, the place is no longer a bona fide restaurant, is disapproved.

It is true, of course, that a restaurant would not be bona fide if it were created or operated as a mere subterfuge in order to obtain the right to sell liquor. There must not only be

equipment, supplies, and personnel appropriate to a restaurant, together with a real offer or holding out to sell food whenever the premises are open for business, but there must also be *actual* and *substantial* sales of food. A close analogy in this respect is afforded by *United States* v. *Carolina Freight Carriers Corp.*, 315 U.S. 475, 480-481 [62 S.Ct. 722, 86 L.Ed. 971], where the court, interpreting a statute requiring ''bona fide operation'' of a motor carrier, stated ''That standard carries the connotation of substantiality. It also makes clear that a holding out to serve . . . is not alone sufficient. It is 'actual rather than potential or simulated service' which is required. . . . Substantial, as distinguished from incidental, sporadic, or infrequent, service is required.''

The record shows that McMillan's establishment was equipped and staffed to serve food; that the cafe was held out to the public as a place where meals could be obtained; and that chicken sandwiches, steak sandwiches, and chicken dinners were commonly served on the premises. There is no evidence that food was ever refused when requested. While gross income from food was less than that from liquor, it does not appear that the respective amounts were so disproportionate as to show that the sales of food constituted a mere subterfuge. Under all the circumstances, therefore, it is our opinion that the evidence supports the conclusion of the board that the licensee operated a bona fide restaurant.

It must next be determined whether the licensee operated a ''public saloon, public bar or public barroom,'' since it appears from section 22 of article XX that not even a bona fide restaurant or hotel may maintain such a room. No other interpretation will give full effect to the section which, after first banning saloons, and barrooms, states that *''subject to the aforesaid restriction''* liquors may be served in certain enumerated places. It follows, therefore, that all saloons and barrooms are prohibited whether or not they are located on premises which are otherwise qualified to serve intoxicating liquors.

A ''saloon'' has been defined generally as ''a shop where intoxicating liquors are sold and drunk, commonly without meals.'' (See Webster's New International Dictionary (1942).) Section 2(m) of the Alcoholic Beverage Control Act, as amended in 1945 (Stats. 1945, pp. 2615, 2618; 2 Deering's Gen. Laws, Act 3796, § 2(m)) gives a more specific definition,

as follows: " '*Public bar*,' or '*public saloon*' or '*public bar-room*' means and shall be deemed to be premises maintained and operated for the selling or serving of alcoholic beverages, other than beer, to the public for consumption on the premises, and which are not equipped and maintained for the sale and service of meals to the public, and in which meals are not actually sold and served to the public." (Italics added.) The statutory definition, which is of persuasive although not controlling authority (see *Delaney* v. *Lowery,* 25 Cal.2d 561, 569 [154 P.2d 674]), is consistent with section 22 of article XX.

The use of a bar or counter in a restaurant for service of liquor does not necessarily constitute the premises a "public saloon, public bar or public barroom," since restaurants and cafes which do not sell liquor frequently have counters. If, however, a bar is employed for the serving of intoxicating beverages, it must be located in the restaurant, and meals must be served at the bar whenever requested.

The evidence in the present case does not show that the licensee operated a saloon or barroom within the meaning of the Constitution. As stated above, meals were served when requested and the amount of actual sales of food was sufficient for a bona fide restaurant business. Although the cafe was divided into two parts, in one of which was a bar used for service of liquor, the partition consisted only of a line of booths about five feet high; a person could see over the partition; and the entertainment which was provided could be observed and heard in both portions of the room. Also, food could be obtained at the bar, and there is nothing in the record to indicate that the bar was ever kept open for business at a time when meals were not available.

The evidence supports the decision of the board, and, accordingly, the judgment must be reversed.

Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.