[No. B219247. Second Dist., Div. Three. Mar. 25, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
GLADYS MARTIN SCHLIMBACH et al., Defendants and Appellants.

COUNSEL

Beatificato & Associates, Mary Helen Beatificato; and Ronald Talmo for Defendants and Appellants.

Carmen A. Trutanich, City Attorney, Asha Greenberg, Managing Assistant City Attorney, and Rebecca J. Gardner, Deputy City Attorney, for Plaintiff and Respondent.

Matthew D. Botting, David W. Sakamoto and Dean R. Lueders for California Department of Alcoholic Beverage Control as Amicus Curiae on behalf of Plaintiff and Respondent.

OPINION

**CROSKEY, J.**—Defendant and appellant Gladys Martin Schlimbach operates Le Blanc Café, a restaurant and bar. Between August 2007 and July 2008, Schlimbach's employees were arrested seven times for selling alcohol to obviously intoxicated patrons, a misdemeanor. As a result of these arrests, on September 10, 2008, the Los Angeles City Attorney, acting on behalf of the People of the State of California, brought this action against Schlimbach[1] to declare her premises a public nuisance under the Unlawful Liquor Sale

---

[1] The action was also brought against the owners of the property; Schlimbach is a lessee. The owners are not parties to this appeal.

Abatement Law (Pen. Code, §§ 11200–11207) and for unlawful business practices (Bus. & Prof. Code, § 17200). On cross-motions for summary judgment, the trial court concluded that no triable issues of fact existed and that (1) the bar constituted a nuisance; and (2) unlawful business practices were permitted at the bar. A permanent injunction followed, imposing limits on Schlimbach's conduct of her business in order to avoid future sales of alcohol to obviously intoxicated persons. Schlimbach was also ordered to pay civil penalties, attorney fees, investigative fees, and court costs. Schlimbach appeals. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The complaint in this action was filed on September 10, 2008. It alleged two causes of action against Schlimbach: (1) violation of the Unlawful Liquor Sale Abatement Law; and (2) unlawful business practices. The latter cause of action purported to "borrow" the violation of the Unlawful Liquor Sale Abatement Law itself.[2] A preliminary injunction was entered, and ultimately amended to terms less restrictive to Schlimbach.

The People moved for summary judgment or summary adjudication of the issues. The People's evidence[3] included a declaration from Los Angeles Police Department (LAPD) Sergeant Raymond Marquez to the effect that (1) he had received numerous complaints from residents and businesses in the area of Le Blanc Café; (2) there had been several arrests of individuals for driving under the influence, in which the individuals stated that they had been drinking at Le Blanc Café; (3) LAPD officers provided Standardized Training for Alcohol Retailers (STAR) at Le Blanc Café for 12 Le Blanc Café employees on July 31, 2007; (4) STAR training includes a discussion of the law regarding serving alcohol to intoxicated persons and how to recognize the symptoms of an intoxicated person; and (5) after the STAR training, Sergeant Marquez directed officers to conduct undercover investigations at Le Blanc Café.

---

[2] At one point, the complaint also made reference to violations of Business and Professions Code section 25602, subdivision (a), which declares the sale of alcohol to obviously intoxicated persons to be a misdemeanor, as supporting a finding of unlawful business practices. However, the case was pursued on the theory that only the violation of the Unlawful Liquor Sale Abatement Law supported the finding of unlawful business practices. Schlimbach makes no argument that *multiple* civil penalties awarded against her for unlawful business practices were excessive, because the unlawful business practices finding was based on a *single* nuisance finding under the Unlawful Liquor Sale Abatement Law.

[3] Schlimbach submitted evidentiary objections to some of the People's evidence. Although the reporter's transcript generally indicates that the trial court ruled on evidentiary objections, Schlimbach declined to designate the rulings on her objections for inclusion in the record on appeal. We therefore assume all of the People's evidence was admissible.

The People also presented evidence of the results of those undercover investigations, which demonstrated seven incidents (on five different days)[4] of the sale of alcohol to obviously intoxicated persons, which we now discuss. First, an August 2, 2007 police report indicates that waitress Avra Tanahubia served a beer to a patron who had slurred, unintelligible speech and needed to put his hand on another person's shoulder for balance when he stood. Thereafter, he asked for yet another beer; Tanahubia ignored him, but bartender Garduno Ramos sold the patron a second beer, despite the fact that the patron's speech was still slurred and unintelligible, and his face appeared reddish and droopy. Tanahubia and Ramos were both arrested for selling alcohol to an obviously intoxicated person. The patron's blood-alcohol level was tested to be 0.14 percent.

Second, a January 26, 2008 arrest report indicates that waitress Elvia Chacon sold a pair of beers to a patron whose speech was loud, slurred and unintelligible, eyes were glossy and bloodshot, and body was swaying on a barstool. The patron fumbled with his money to pay; Chacon reached over and helped the patron select the right amount of money. Chacon was arrested for selling alcohol to an obviously intoxicated person. The patron's blood-alcohol level was tested to be 0.24 percent.

Third, a February 14, 2008 arrest report indicates that waitress Tanahubia sold two beers to the companion of a man whose face was flushed and who spoke with slurred and unintelligible speech. The man then knocked his beer over, causing it to spill. The man walked out of the bar briefly, and returned 15 minutes later. He tried to get Tanahubia's attention. She initially ignored him, but when he, with slurred speech, asked her for a beer, she sold him one. Tanahubia was arrested for selling alcohol to an obviously intoxicated person. The patron's blood-alcohol level was tested to be 0.068 percent. At the same time, waitress Johanna Junay brought a pitcher of beer to a group of six men, one of whom swayed from side to side when he walked to the bathroom, had a flushed face, and displayed glossy and bloodshot eyes. After Junay brought the group the pitcher, the man made an unintelligible comment that they were drunk and were being served beer in front of the LAPD. Junay walked away and returned with a second pitcher of beer for the group. The man served himself a glass of beer, from the pitcher, in Junay's presence. Junay was

---

[4] As the incidents occurred on five different days, Schlimbach repeatedly refers to them as only five incidents. But the first arrest report indicates the arrest of two different employees for two different sales of beer to the same obviously intoxicated person. The third arrest report involves the arrest of two employees, for two different sales of beer to two different obviously intoxicated persons. Each report clearly relates to multiple incidents taking place on the same day, not multiple arrests arising from the same incident. In each case, each of the two employees was arrested for a *different sale*.

arrested for selling alcohol to an obviously intoxicated person. The patron's blood-alcohol level was tested to be 0.127 percent.

Fourth, an April 10, 2008 arrest report indicates that Tanahubia served a beer to a man who had been served three beers in rapid succession. The man had an unsteady gait, and overtly slouched on a barstool. His face was flushed and he turned his head with involuntary movements. He had difficulty obtaining the money from his wallet to pay for the beer. Tanahubia was arrested (for the third time) for selling alcohol to an obviously intoxicated person. At this point, Tanahubia spontaneously told the officers that the patron had entered the bar already drunk and had not been served a beer. The man was arrested for public drunkenness. His blood-alcohol level was tested to be 0.208 percent.

Fifth and finally, a July 3, 2008 arrest report indicates that waitress Aleyda Salazar-Siqueros brought a pitcher of beer to a booth where a particular patron was sitting with other people. The patron was slouching and his head moved slowly up and down as he spoke. He talked with Salazar-Siqueros as he swayed and laughed. He drank some beer and Salazar-Siqueros left the table. He continued drinking in her view. Later, Salazar-Siqueros returned to the booth with another pitcher of beer and refilled the patron's glass, among others. Salazar-Siqueros was arrested for selling alcohol to an obviously intoxicated person. The patron's blood-alcohol level was tested to be 0.18 percent.

Schlimbach filed her own motion for summary judgment or summary adjudication, as well as an opposition to the People's motion. Schlimbach relied on her own declaration, as well as the declarations of her employees Tanahubia and Junay. The intended overall effect of this evidence was to establish that the patrons in question were not intoxicated when sold alcohol and, if they were, they were not *obviously* intoxicated. Schlimbach noted that charges against her employees were not pursued by the authorities, except in one instance in which the charges were successfully defeated.[5] In short, Schlimbach sought to establish that her employees were properly trained, and did not serve alcohol to obviously intoxicated persons. Instead, she argued that she was simply being harassed by the police.

However, the People interposed substantial objections to Schlimbach's evidence, many of which were sustained. Schlimbach's declaration testimony regarding police harassment was excluded. More importantly, with one

---

[5] The evidence indicates that Tanahubia was exonerated in one instance. The evidence does not indicate which instance.

exception, objections were sustained to the testimony of Schlimbach and her employees to the effect that the patrons served were not obviously intoxicated. Schlimbach does not contest any of these rulings on appeal; therefore, her attempts to rely on this evidence on appeal are improper.[6] The trial court overruled the objection, however, with respect to Tanahubia's declaration that the patron she served on April 10, 2008, was not obviously intoxicated when she served him. This testimony, and the fact that Tanahubia was exonerated on one of the charges (which may be the charge arising from the same incident) appears to be the only evidence which directly contradicts the People's evidence regarding seven incidents of selling alcohol to obviously intoxicated persons.[7]

The case proceeded to a hearing. The statute at issue, the Unlawful Liquor Sale Abatement Law, provides as follows: "Every building or place used for the purpose of unlawfully selling, serving or giving away any spirituous, vinous, malt or other alcoholic liquor, and every building or place in or upon which such liquors are unlawfully sold, served or given away, is a nuisance which shall be enjoined, abated and prevented, whether it is a public or private nuisance." (Pen. Code, § 11200.) The trial court concluded that no triable issue of fact existed as to violation of this statute, because the property has been used for the purpose of the unlawful selling of alcoholic beverages, in the sense that sales to obviously intoxicated persons are unlawful sales. Relying on this conclusion, the trial court also found no triable issue of fact as to whether Schlimbach engaged in unlawful business practices, as her business practices violated the Unlawful Liquor Sale Abatement Law. Thus, the People's motion for summary adjudication of these issues was granted,

---

[6] In any event, some of Schlimbach's evidence is so incredible as to be simply unworthy of belief. For example, Schlimbach declared that the patron in the January 26, 2008 incident is a regular patron of the bar whose "mannerisms, or lack thereof, are such that he appears to be intoxicated, even when he is not." As the patron's blood-alcohol level was tested to be 0.24 percent, no argument can be made that the patron was not actually intoxicated. Similarly, Tanahubia testified that the patron she served on August 2, 2007, "has a speech impediment, which causes him to stutter and slur his words. . . . Thus, if [the officer] observed this . . . patron with unintelligible or slurred speech, it was a result of his speech impediment and not because he was intoxicated." As the patron's blood-alcohol level was subsequently tested to be 0.14 percent, the patron was, in fact, intoxicated.

[7] The trial court overruled objections to Junay's testimony that the city declined to prosecute her, and Tanahubia's testimony that the city declined to prosecute her for two incidents. It sustained the objection to Schlimbach's testimony that no charges were filed with respect to any other incident. Thus, at most, there is admissible testimony that Tanahubia was exonerated of one charge and the city declined to further prosecute three of remaining six charges. That the city declined to criminally prosecute Schlimbach's employees for some of the charges does not give rise to an inference that the facts underlying those charges did not occur. It is possible that, for example, the city declined to use its resources pursuing first offenders. Indeed, given the number of offenses at Le Blanc Café, the city attorney may well have determined that prosecuting individual waitstaff and bartenders would not solve the problem, and chose instead to pursue the instant nuisance proceeding.

and Schlimbach's cross-motion was denied. The court set the matter for additional briefing and a hearing on the issue of the terms of any permanent injunction, as well as costs, civil penalties, and attorney fees.

After the hearing, the court entered judgment in favor of the People and against Schlimbach. Schlimbach was permanently enjoined, in general terms, from occupying the property for the purposes of the unlawful sale of alcoholic beverages. In more specific terms, she was directed to implement the following six provisions: (1) not employ individuals who have been convicted of alcohol-related violations; (2) require all employees to attend STAR training within six months of employment; (3) not allow employees to unlawfully sell, serve or give away any alcoholic beverage to an obviously intoxicated person; (4) employ one uniformed security guard to work at Le Blanc Café when there is live entertainment; (5) keep the kitchen operational and food service available at all hours that the business is open; and (6) maintain and post signs in English and Spanish that state, "PERSONS UNDER THE AGE OF 21 AND INTOXICATED PERSONS WILL NOT BE SERVED ALCO-HOLIC BEVERAGES."

A monetary judgment was also entered against Schlimbach, in the amount of $41,274.70. This amount was comprised of $7,000 in civil penalties, $9,954.70 in investigation costs, $320 in court fees, and $24,000 in attorney fees. The amount of the attorney fee award was substantially reduced from the $44,250 which had been sought by the People.

Schlimbach filed a timely notice of appeal. As one of the issues raised by Schlimbach on appeal was that the trial court's judgment impeded on the exclusive jurisdiction of the Department of Alcoholic Beverage Control (ABC), we invited amicus curiae briefing from the ABC.[8]

### CONTENTIONS ON APPEAL

On appeal, Schlimbach argues the following: (1) the trial court improperly weighed the evidence on summary judgment; (2) the facts were insufficient to

---

[8] We also invited amicus curiae briefing from the California Attorney General, the California Council on Alcohol Policy, and a law firm identified by Schlimbach as having expertise in matters involving the ABC. Only the ABC accepted our invitation, although the Attorney General's letter impliedly indicates agreement with the briefs filed by the ABC and the city attorney. The parties were granted an opportunity to respond to the amicus curiae brief submitted by the ABC. Although the position taken by the ABC was adverse to Schlimbach's position, she declined to submit further briefing.

support the court's finding of a public nuisance under the Unlawful Liquor Sale Abatement Law, as (a) a few isolated incidents do not establish that the property was "used for the purpose" of unlawful alcohol sales and (b) the Unlawful Liquor Sale Abatement Law was intended to address taverns and saloons operating without a license, not licensed premises where a few unlawful sales may occur; (3) the imposition of conditions on the conduct of Schlimbach's business impermissibly interfered with the exclusive jurisdiction of the ABC both (a) to seek to enjoin the sale of alcoholic beverages to obviously intoxicated persons and (b) to impose the conditions under which licensees may sell alcohol; and (4) the amount of attorney fees awarded was not properly supported by the evidence submitted.

## DISCUSSION

1. *Standard of Review*

"The policy underlying motions for summary judgment and summary adjudication of issues is to ' "promote and protect the administration of justice, and to expedite litigation by the elimination of needless trials." ' " (*Hood v. Superior Court* (1995) 33 Cal.App.4th 319, 323 [39 Cal.Rptr.2d 296].)

"Any party may move for summary judgment in any action or proceeding if it is contended that the action has no merit or that there is no defense to the action or proceeding." (Code Civ. Proc., § 437c, subd. (a).) The motion and the opposition to the motion "shall be supported by affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice shall or may be taken." (*Id.*, subd. (b).) Separate statements setting forth plainly and concisely all material facts the parties contend are undisputed must be included. (*Ibid.*) "Evidentiary objections not made at the hearing shall be deemed waived." (*Ibid.*) "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence . . . and all inferences reasonably deducible from the evidence, except summary judgment may not be granted . . . on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (*Id.*, subd. (c); see *KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1028 [37 Cal.Rptr.2d 431].)

A plaintiff or cross-complainant has met his or her burden upon a motion for summary judgment or summary adjudication if that party has proved each

element of the cause of action entitling the party to judgment on that cause of action. The burden of proof at trial is relevant to the burden of production borne by the plaintiff moving for summary judgment. "[I]f a plaintiff who would bear the burden of proof by a preponderance of evidence at trial moves for summary judgment, he must present evidence that would *require* a reasonable trier of fact to find any underlying material fact more likely than not—otherwise, he would not be entitled to judgment *as a matter of law*, but would have to present his evidence to a trier of fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 851 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

Once the plaintiff or cross-complainant has met that burden, the burden shifts to the opposition to show a triable issue of fact exists. In opposing the motion, the defendant or cross-defendant may not simply rely upon allegations or denials of the pleadings; the defendant or cross-defendant must set forth specific facts showing that a triable issue of material fact exists. (Code Civ. Proc., § 437c, subd. (*o*)(1).)

Summary adjudication motions are restricted to an entire cause of action, an affirmative defense, a claim for punitive damages, or an issue of duty. (Code Civ. Proc., § 437c, subd. (f)(1); *Hood v. Superior Court, supra*, 33 Cal.App.4th at p. 323.) "A motion for summary adjudication may be made by itself or as an alternative to a motion for summary judgment and shall proceed in all procedural respects as a motion for summary judgment." (Code Civ. Proc., § 437c, subd. (f)(2).)

2. *The Trial Court Did Not Improperly Weigh the Evidence on Summary Judgment*

Schlimbach contends that the trial court improperly weighed the evidence in ruling on the summary judgment/summary adjudication motions, rather than simply determining whether a triable issue of fact existed. We disagree. Schlimbach relies on an excerpt from the transcript of the hearing, in which her counsel argued that she raised a triable issue of fact on the issue of whether the patrons were obviously intoxicated when her employees had served them, because she had submitted declarations from those employees saying that the patrons did not display any visible symptoms of intoxication. In rejecting the argument that this evidence failed to raise a triable issue of fact, the court stated, "So the court can look at the credibility and look at the documents. We have police officers, vice squad officers, who had seen what appeared to be intoxicated persons there." Schlimbach argues that this

language indicates the trial court improperly weighed the credibility of her evidence against the People's evidence, rather than simply determining that the conflict in the evidence created a triable issue of fact necessitating denial of the People's summary judgment motion.

While the trial court's language was perhaps inartfully phrased, we find no error because, as discussed above, evidentiary objections were sustained to the testimony of Schlimbach, Tanahubia and Junay to the effect that the bar patrons served were not obviously intoxicated (with exceptions applying to, at most, two incidents). Schlimbach does not challenge these evidentiary rulings on appeal; we therefore assume that they are correct. As there was *no* admissible evidence relating to five of the seven incidents (nor any challenge to the People's evidence of drunk driving arrests where the drivers had been drinking at Le Blanc Café) there was simply no evidence to weigh, and the trial court did not err in failing to find a triable issue of material fact.[9]

### 3. *The Facts Were Sufficient to Support a Finding of Nuisance Under the Unlawful Liquor Sale Abatement Law*

Schlimbach next contends that the facts did not support a finding of nuisance under the Unlawful Liquor Sale Abatement Law. This encompasses two arguments: first, that a few isolated sales do not amount to a nuisance under the plain language of the statute; and second, that the statute was intended to address only the *unlicensed* sale of alcohol.

■ Schlimbach's statutory language argument is easily addressed. As discussed above, Penal Code section 11200 provides, "Every building or place used for the purpose of unlawfully selling, serving or giving away any spirituous, vinous, malt or other alcoholic liquor, and every building or place in or upon which such liquors are unlawfully sold, served or given away, is a nuisance which shall be enjoined, abated and prevented, whether it is a public or private nuisance." Schlimbach, focusing solely on the first clause of the statute, argues that her bar could not be "used for the purpose" of unlawfully selling alcohol when there were only a handful of unlawful sales among (presumably) tens of thousands of lawful sales. "Used for the purpose," according to Schlimbach, must refer to a primary use of the building, not an incidental one. Yet even if Schlimbach were correct in this interpretation, she

---

[9] Moreover, a trial court may weigh the credibility of a declaration submitted in opposition to a summary judgment motion and grant the motion "where the declaration is facially so incredible as a matter of law that the moving party otherwise would be entitled to summary judgment." (*Estate of Housley* (1997) 56 Cal.App.4th 342, 359–360 [65 Cal.Rptr.2d 328].) As discussed above (see fn. 6, *ante*), some of Schlimbach's evidence, to the effect that the patrons appeared intoxicated when they were not, was simply incredible in the face of undisputed evidence regarding their blood-alcohol content.

overlooks the remainder of the statutory language, which also declares as a nuisance any building "in . . . which such liquors are unlawfully sold." While "used for the purpose" could conceivably relate to a primary use, "in . . . which" simply refers to the events taking place at the location. Thus, even if Le Blanc Café was not primarily used for the unlawful sale of alcohol, the five undisputed incidents of unlawful alcohol sales establish that Le Blanc Café was a location *in which* alcohol was unlawfully sold. Moreover, it is not simply that five unlawful sales of alcohol occurred at the location which rendered it a nuisance. These sales occurred *after* the police had contacted Schlimbach and provided STAR training for her staff. In addition to these sales, there were many incidents of drunk driving in which the driver indicated that he or she had been drinking at Le Blanc Café. Police also received numerous complaints from neighboring residents and businesses. Taken together, this is not a situation in which an injunction was sought because of five isolated incidents. The evidence demonstrates that Le Blanc Café was a place where, as a matter of course, alcohol was sold to obviously intoxicated people, and constituted a nuisance. Thus the location was de-scribed by the statute.

Schlimbach's other argument is directed more to the purpose of the Unlawful Liquor Sale Abatement Law. She argues that the law, which predates Prohibition,[10] was intended to provide a remedy against unlicensed saloons and taverns. In other words, Schlimbach contends the statute was intended to address the problem caused by speakeasies, in which *every* sale of alcohol was an unlawful sale, because the location was not authorized to sell alcohol at all. Certainly, the statute has applied in such situations. (E.g., *Hammond v. McDonald* (1939) 32 Cal.App.2d 187, 194 [89 P.2d 407].) Indeed, in 1982, this appellate division applied the statute to defendants who had continued to sell alcoholic beverages despite the fact that their license to do so had been revoked. (*Department of Alcoholic Beverage Control v. Locker* (1982) 129 Cal.App.3d 381 [181 Cal.Rptr. 55].) But simply because previous applications of the statute have occurred in such a context does not mean that the statute does not have a broader reach.

■ Indeed, the statutory language itself is not amenable to such a narrow interpretation. The statute addresses locations in which alcoholic beverages are "unlawfully sold," not locations in which alcoholic beverages are "sold without a proper and effective license." The plain meaning of "unlawful" is "against the law; illegal" (Webster's New World Dict. (3d college ed. 1991) p. 1460); thus, it would appear that if a sale of alcohol is against the law for any reason, that sale would be unlawful. Case authority supports this

---

[10] Current Penal Code section 11200 was enacted in 1953, but derives from 1915 legislation.

interpretation. In *People v. Robin* (1943) 56 Cal.App.2d 885 [133 P.2d 436], the court was considering the propriety of an injunction which prohibited the defendants from " 'unlawfully selling, serving, or giving away intoxicating liquor, or permitting, suffering, consenting to or acquiescing in the unlawful selling, serving, or giving away of intoxicating liquor in or upon the premises [described] or upon any premises now or hereafter under the control of said defendant[s].' " (*Id.* at p. 888.) The court reversed for several reasons, including that "there are no findings that any of the defendants had sold or threatened to sell liquor out of hours, to minors, or otherwise illegally. The decrees that they be prohibited from doing so were therefore without support in the findings." (*Id.* at p. 889.) In other words, one is "unlawfully selling" alcoholic beverages if one is selling them out of hours, to minors, or otherwise illegally, not simply if one is selling them without a license. In this case, Schlimbach's employees were selling alcohol to obviously intoxicated persons. This is illegal. (Bus. & Prof. Code, § 25602, subd. (a).) It is therefore unlawful. This is a sufficient basis for a finding of nuisance under the Unlawful Liquor Sale Abatement Law.

4. *There Is No Interference with the Exclusive Jurisdiction of the ABC*

Schlimbach's next contention is that the trial court's judgment impermissibly interfered with the exclusive jurisdiction of the ABC. This, too, encompasses two arguments: first, that the ABC has exclusive jurisdiction to seek to enjoin the sale of alcoholic beverages to obviously intoxicated persons; and second, that the ABC has exclusive jurisdiction to impose conditions under which licensees may sell alcohol.

We begin with the indisputable premise that, under the California Constitution, "The Department of Alcoholic Beverage Control shall have the exclusive power, except as herein provided and in accordance with laws enacted by the Legislature, to license the manufacture, importation and sale of alcoholic beverages in this State, and to collect license fees or occupation taxes on account thereof. The department shall have the power, in its discretion, to deny, suspend or revoke any specific alcoholic beverages license if it shall determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals, or that a person seeking or holding a license has violated any law prohibiting conduct involving moral turpitude." (Cal. Const., art. XX, § 22, subd. (d).)

We now turn to Schlimbach's first argument, that the ABC has exclusive jurisdiction to seek to enjoin sales of alcohol to obviously intoxicated

persons. Business and Professions Code section 25602, subdivision (a) provides, "Every person who sells, furnishes, gives, or causes to be sold, furnished, or given away, any alcoholic beverage to any habitual or common drunkard or to any obviously intoxicated person is guilty of a misdemeanor." Business and Professions Code section 25602.2 provides, "The director [of the ABC] may bring an action to enjoin a violation or the threatened violation of subdivision (a) of Section 25602." Schlimbach argues that since Business and Professions Code section 25602.2 permits the director of the ABC to seek to enjoin a sale of alcohol to an obviously intoxicated person, and the statute does not permit anyone else to seek such an injunction, no one else may do so under any other statute.

■ Schlimbach's conclusion does not follow. There is nothing in Business and Professions Code section 25602.2 which suggests that it provides the only remedy for violations of Business and Professions Code section 25602. Indeed, it does not. Business and Professions Code section 25602 defines a misdemeanor; its violation can lead to criminal prosecution. (See *People v. Smith* (1949) 94 Cal.App.2d Supp. 975 [210 P.2d 98] [conviction under a predecessor statute].) Moreover, violations of Business and Professions Code section 25602 can be punished administratively by the ABC itself. Schlimbach does not question this; indeed, she contends that she was disciplined administratively by the ABC for selling alcohol to obviously intoxicated persons.[11] Thus, although Business and Professions Code section 25602.2 provides *one* remedy for violations of Business and Professions Code section 25602, it is not the exclusive one.

Moreover, the Unlawful Liquor Sale Abatement Law addresses a different problem than that addressed by Business and Professions Code section 25602.2. Business and Professions Code section 25602.2 enables the Director of the ABC to obtain an injunction of a violation or threatened violation of Business and Professions Code section 25602. The Unlawful Liquor Sale Abatement Law, in turn, is addressed to the "building or place" where such violations, among other things, occur. (Pen. Code, § 11200.) The statutes

---

[11] The record indicates Schlimbach's license number. According to the ABC's Web site, Schlimbach's license was twice suspended for violating Business and Professions Code section 25602. (<http://www.abc.ca.gov/datport/LQSdata.asp?ID=19272262> [as of Mar. 25, 2011].) In a footnote in her brief on appeal, Schlimbach argues, for the first time, that the trial court should have given collateral estoppel effect to the ABC's decision regarding whether she violated Business and Professions Code section 25602 and what the appropriate sanction should be. As the argument was not raised before the trial court, we need not address it. In any event, the party against whom collateral estoppel is sought must be the same as, or in privity with, the party to the former proceeding. (*County of Los Angeles v. Superior Court* (2000) 82 Cal.App.4th 819, 829 [98 Cal.Rptr.2d 564].) There is no suggestion that the People are in privity with the ABC. If anything, the administrative proceedings may have collateral estoppel effect *against* Schlimbach—that is, having twice been found to have violated Business and Professions Code section 25602, she may be estopped from arguing that she did not violate it.

provide different remedies for different problems. While in some cases, like this one, there may be some overlap, Business and Professions Code section 25602.2 does not prevent Penal Code section 11200 from being applied to premises on which there has been the sale of alcohol to obviously intoxicated persons. (Cf. *Hammond v. McDonald, supra*, 32 Cal.App.2d at p. 194 [stating there is nothing in the former Alcoholic Beverage Control Act which makes proceedings against a licensee's license an exclusive remedy for a violation; the Unlawful Liquor Sale Abatement Act provides an additional remedy].)

■ Schlimbach's second argument is that the administrative jurisdiction of the ABC is exclusive, preventing the trial court from issuing an injunction which imposes any restrictions on her license to sell alcohol. While it is undisputed that the California Constitution gives the ABC exclusive jurisdiction to license and regulate the "manufacture, importation and sale of alcohol," the ABC's exclusive jurisdiction to do so does not preempt an authorized party from seeking to enjoin a nuisance under the Unlawful Liquor Sale Abatement Law. (See *Covert v. State Board of Equalization* (1946) 29 Cal.2d 125, 130 [173 P.2d 545] [the Unlawful Liquor Sale Abatement Law authorizes an abatement proceeding against the building or place used; it does not permit any attack on the license].)

Moreover, in the context of preemption of city ordinances, it has been established that the exclusive grant of jurisdiction to the ABC does not preempt ordinances which "may have some indirect impact of the sale of alcoholic beverages" if they do not seek to control alcohol sales. (*Korean American Legal Advocacy Foundation v. City of Los Angeles* (1994) 23 Cal.App.4th 376, 389 [28 Cal.Rptr.2d 530].) Indeed, "a city ordinance addressing nuisance problems associated with alcoholic beverage sale establishments does not improperly regulate preexisting . . . licensees . . . ." (*City of Oakland v. Superior Court* (1996) 45 Cal.App.4th 740, 747 [53 Cal.Rptr.2d 120].) While the ABC's exclusive right to regulate the sale and purchase of alcohol may prevent a city from enacting " 'such regulatory measures as "restrictions as to the class of persons to whom liquors may be sold, and as to the hours of the day and the days of the week during which places of sale may be open," ' " it does not preempt an ordinance that "does not directly affect the licensee's ability to sell alcoholic beverages to a willing purchaser." (*California Restaurant Assn. v. City of Los Angeles* (1987) 192 Cal.App.3d 405, 410–411 [237 Cal.Rptr. 415].) Thus, for example, an ordinance requiring the posting of health warnings where alcoholic beverages are sold is not preempted. (*Id.* at pp. 407, 411.)

It is apparent, then, that the ABC's exclusive regulatory jurisdiction does not, as a general matter, prevent a nuisance abatement action under the Unlawful Liquor Sale Abatement Act. Nor does it prevent the trial court from

entering an injunction which affects the licensee's business, when the injunction does not directly affect the licensee's ability to sell alcoholic beverages to a willing purchaser.

In this case, none of the restrictions imposed by the injunction (i.e., not employ individuals convicted of alcohol-related violations, require employees to attend STAR training, not allow sales to obviously intoxicated persons, employ a security guard when there is live entertainment, have food service available when the business is open, and post signs) restrict Schlimbach's right to sell alcohol to willing purchasers.[12] The restrictions are imposed simply to prevent future sales to obviously intoxicated persons, and abate the nuisance which had arisen from the practice of such sales at Le Blanc Café. There is no improper interference with the jurisdiction of the ABC.[13]

### 5. *Attorney Fees*

Under Civil Code section 3496, subdivision (d), the trial court has authority to award costs, including costs of investigation and reasonable attorney fees, to the prevailing party in any case in which the government seeks to enjoin the unlawful sale of alcohol under the Unlawful Liquor Sale Abatement Law. We review the trial court's order awarding fees for abuse of discretion. (*City of Santa Rosa v. Patel* (2010) 191 Cal.App.4th 65, 68 [119 Cal.Rptr.3d 585].)

The "lodestar" method of calculating fees is the appropriate method for a fee award under Civil Code section 3496. (*City of Santa Rosa v. Patel, supra*, 191 Cal.App.4th at p. 71.) Using that method, the People sought to recover fees in the amount of $44,250, calculated at 177 hours at $250 per hour. The deputy city attorney who was the lead attorney on the case submitted a declaration, based on personal knowledge, itemizing 162 hours by date and task, in one-hour increments. An assistant city attorney submitted a similar

---

[12] In its amicus curiae brief, the ABC takes the position that "none of the conditions imposed appear to directly regulate the manufacture, sale, purchase, possession or transportation of alcoholic beverages."

[13] In our letter inviting amicus curiae briefing, we asked the amici curiae (and the parties, in response) to address the issue of whether any injunctive relief ordered under the Unlawful Liquor Sale Abatement Law could impose specific restrictions on the violator's future business practices beyond an order to commit no further violations. The ABC argued only that the restrictions imposed in this case did not interfere with its regulatory jurisdiction; it took no position as to whether the conditions imposed in this case were otherwise appropriate. Schlimbach argued only that the restrictions were an improper interference with the ABC's regulatory jurisdiction. She raised no argument that the Unlawful Liquor Sale Abatement Law itself permitted only an injunction preventing further unlawful sales, not restrictions intended to prevent future misconduct. Nor did Schlimbach argue that the specific restrictions imposed in this case were overbroad, given the established misconduct.

declaration relating to 15 additional hours. At the hearing on the motion, the trial court stated, "I don't doubt that the People spent the hours stated," but questioned the use of a "standard attorney billing rate[]." The court ultimately awarded attorney fees in the amount of $24,000, slightly less than 55 percent of the amount requested. The court did not explain the basis for the amount awarded.

Schlimbach raises three challenges to the amount of fees awarded. None are persuasive. First, she argues that the deputy city attorney's declaration "contained no information attesting to the fact that [counsel] kept track of the hours worked," as set forth in her declaration. Yet Schlimbach provides no authority for the proposition that a declaration regarding attorney hours worked, based on personal knowledge, must be supported by contemporaneous recordkeeping. Second, Schlimbach argues that it is "appalling" that the time is itemized in one-hour increments. Schlimbach concedes that the proper procedure in such an instance is for the court to partially reduce the fee award to account for unearned time which may be included, but does not suggest how the trial court's reduction of more than 45 percent of the amount sought was not more than adequate to take this into account. Third, Schlimbach argues that the hours allegedly spent on some of the documents filed were "patently unreasonable." The trial court reviewed the hours claimed and specifically concluded that they had been spent. Schlimbach's claims of patent unreasonability do not establish an abuse of discretion. For example, Schlimbach argues that the 50 hours (over 13 days) claimed for "Draft opposition to Defendant Schlimbach's motion for summary judgment" were excessive because the opposition "totaled 9 pages." Yet these entries, which begin shortly after Schlimbach's motion for summary judgment was served, clearly encompass reviewing the motion and researching the opposition. Moreover, the opposition consisted not of nine pages, but (1) an 18-page points and authorities; (2) separate evidentiary objections to the declarations of Schlimbach, Tanahubia, and Junay; (3) a request for judicial notice; and (4) a response to Schlimbach's separate statement. Given these substantial filings, 50 hours does not appear patently unreasonable, and the trial court did not err in failing to so find.[14] In any event, we again note that the fees awarded were substantially reduced from those claimed. Given the record before us and the issues presented by the case, we cannot conclude that a $24,000 fee award constituted an abuse of discretion.

---

[14] Schlimbach also challenges the time spent on, among other things, an opposition to her motion to set aside the preliminary injunction, and a response to a request for document production. Neither document is included in the record on appeal. There is clearly no basis on which we can determine whether the attorney time claimed in preparing these documents was reasonable.

## *DISPOSITION*

The judgment is affirmed. The People shall recover their costs, and attorney fees, on appeal.

Klein, P. J., and Aldrich, J., concurred.